[Civ. No. 447.   Third Appellate District.—July 11, 1908.]

BOARD OF DIRECTORS OF WOMAN'S RELIEF CORPS HOME ASSOCIATION OF CALIFORNIA, Petitioner, v. A. B. NYE, State Controller, Respondent.

MANDAMUS TO STATE CONTROLLER—APPROPRIATION FOR WOMAN'S RELIEF CORPS HOME—ELEEMOSYNARY CORPORATION MADE STATE INSTITUTION.—The Woman's Relief Corps Home Association, an eleemosynary corporation, having been intended to be made, and having been practically made, a state institution, and placed under state control by the act of 1897, appropriating the sum of $10,000 "for the support and maintenance of the ex-army nurses and the widows, wives, mothers, and dependent destitute maiden daughters or sisters of Union veterans who served honorably in the Civil War, residing in the home at Evergreen, Santa Clara county, under the auspices of the Woman's Relief Corps Home Association," to be paid in annual installments as directed, mandamus will lie at the instance of its directors, appointed by the governor, and sworn as state officers under the act to compel the state controller to draw his warrant for the unexpended balance of such appropriation, which had been audited and approved by the state board of examiners, in conformity with said act.

ID.—EXPRESS DECLARATION NOT ESSENTIAL TO ESTABLISH STATE INSTITUTION—CLEAR INTENTION.—It is not essential that the act of 1897 should expressly declare in terms that such eleemosynary corporation is made a state institution. It is sufficient that the clear intention of the legislature to make it such, and to place it under the exclusive management and control of the state, is apparent from its terms.

ID.—CONSTITUTIONAL LAW—POWER TO CHANGE CORPORATION INTO STATE INSTITUTION—PUBLIC PURPOSES.—The constitution does not expressly prohibit the legislature from converting a private corpora-

tion into a state institution. and placing it under state control, provided the purposes sought to be achieved thereby are within the general legislative power, or involve some duty or function of government.

ID.—SUPPORT OF DESTITUTE PERSONS A PUBLIC PURPOSE.—The support of poor and destitute persons unable to care for themselves is a public purpose, clearly within the general legislative power.

ID.—MORAL DUTY TO AID FAMILIES OF VETERANS OF CIVIL WAR.—The strong moral duty of the state to aid in the support of the needy families of veterans of the Civil War is sufficient to sustain a legislative appropriation for that purpose.

ID.—APPROPRIATION NOT A PROHIBITIVE GIFT.—The legislative appropriation made under the act of 1897 is not a gift, within the meaning of the prohibition contained in section 31 of article IV of the constitution.

ID.—SPECIAL LEGISLATION—SUFFICIENT CLASSIFICATION—"VETERANS OF CIVIL WAR."—The "veterans of the Civil War" constitute a class founded upon a natural distinction, consisting of the peculiar and extraordinary services performed by them in the defense and preservation of the federal government as well as the governments of the states, and a general law applicable to them is not special legislation.

ID.—GENERAL LAW INAPPLICABLE—SPECIAL LAW CONSTITUTIONAL.— Though the act of 1897 does not apply, and cannot, in the nature of the case, be made applicable generally to all needy relatives of "Veterans of the Civil War," and applies to such only of them as reside in the "Home" therein described, it is nevertheless within the constitutional power of the legislature to enact special legislation to meet the peculiar circumstances of the case, under the provision contained in subdivision 33 of section 25 of article IV of the constitution.

ID.—GENERAL POWER OF STATE—EXPENDITURES FOR PUBLIC WELFARE.— The state has general power to provide for the public welfare, and to make expenditures therefor, the limits of which are not capable of exact definition.

PETITION for writ of mandate to the State Controller. Writ allowed.

The facts are stated in the opinion of the court.

H. C. Dibble, and Oliver Dibble, for Petitioner.

U. S. Webb, Attorney General, for Respondent.

HART, J.—This is a direct application to this court by the petitioners for a writ of mandate to compel the respondent,

as state controller, to draw his warrant on the state treasurer for the sum of $784.50, which said sum is alleged in the petition to be an unexpended balance of the sum of $10,000 appropriated by the legislature of 1903 for the support and maintenance of the Woman's Relief Corps Home Association, located at Evergreen, Santa Clara county, California.

It is alleged in the petition that the petitioners presented to the state board of examiners a duly verified account and demand for the payment of said sum of $784.50, and that said board, on the fifteenth day of February, 1908, allowed and approved the said account and demand for said sum, and on the same day presented the same to the respondent with the request that he draw his warrant upon the state treasurer in favor of the petitioners for the payment of said claim; and that said respondent, as state controller, refused to draw his warrant on the state treasurer for the same. Annexed to and made part of the petition is a letter from the respondent addressed to the attorney for the petitioners herein, giving his reason for refusing to draw his warrant on the treasurer for the claim. Said letter reads: "Referring to your letter of February 25th, relative to the claim of the Woman's Relief Corps Home Association, I beg to say that there was this day received in this office a claim for support for the half year ending December 31st, 1906, amounting to $784.50, such claim having been passed by the State Board of Examiners. After giving due attention to this claim, I have reached the conclusion that I cannot draw a warrant for the payment of the same, because I am not fully satisfied that the Woman's Relief Corps Home Association is a state institution."

The ground upon which the respondent refuses to draw his warrant, as intimated in the foregoing letter, is that the act making the appropriation for the support and maintenance of the Woman's Relief Corps Home Association is repugnant to certain provisions of the constitution.

The attorney general, representing respondent, has interposed a demurrer to the petition, and thus the questions necessary to be considered and decided are presented.

The legislature of 1897 (Stats. of 1897, p. 447), passed an act, and the governor approved the same, the purpose of which may best be exhibited by reference to the provisions thereof. Section 1 provides for the appropriation of the sum

of $10,000 "for the support and maintenance of the ex-army nurses and the widows, wives, mothers, and dependent destitute maiden daughters or sisters of union veterans who served honorably in the civil war, residing in the home at Evergreen, Santa Clara county, under the auspices of the Woman's Relief Corps Home Association, a corporation duly created and existing under the laws of the state, in the manner following, to wit: The sum of $150 per annum for each ex-army nurse, widow, wife, mother, or maiden daughter or sister, duly admitted and residing in such home; *provided,* the whole of said sum shall not be expended in any one year for such support and maintenance." Section 3 of said act provides that the management and control of said home shall be by a board of eleven directors, *to be appointed by the governor,* six of whom shall be appointed for two years and five of whom for one year, and section 4 provides that "as the terms of office of directors shall expire, or in case of vacancy, the Governor shall appoint their successors. *The Governor shall have power to remove* any director for cause." Section 5 requires that "each member of the board of directors shall take and file *with the secretary of state* the oath of office as provided by law." The third, fourth and fifth subdivisions of section 6 make it incumbent on the board to keep a full record of its meetings, a book containing the monthly accounts, in which shall be entered all moneys received from any and all sources, all disbursements made and the purpose for which made; to keep a payroll of the employees and the amount disbursed to each, at what rate of wages and for the length and kind of services, and to forward to and file with the state board of examiners, at the time of making demand or presenting claims for state aid, a transcript of such books and payroll, verified by the oath of the president or secretary of said home. Section 7 reads: "Every claim for aid under this Act shall be presented to and audited and allowed by the state board of examiners, and when allowed, in whole or in part, by said board of examiners, it shall be the duty of the Controller to draw his warrant for the amount thereof in favor of the president and treasurer of the board of directors of said Home Association, and it shall be the duty of the state treasurer to pay the same on due presentation." Section 9 provides: "The board shall cause to be made a verified report on the fifteenth day of August of each year to the Gov-

ernor, containing a statement of all receipts and expenses, the condition of the home, the number of inmates during the year ending June 30th, and such other matters as may be required by him. All reports shall be verified by the oath of the president and secretary of the board.''

The assault upon the act by the respondent involves, principally, two questions, to wit: 1. Is the Woman's Relief Corps Home Association, by the provisions of said act, placed under the exclusive management and control of the state as a state institution? 2. If the act does make said home a state institution to be exclusively managed and controlled as such by the state, assuming that in view of its purposes it can be made one, did the legislature violate certain provisions of the constitution in the enactment of such legislation?

The fact is conceded that, prior to the passage of the act in question, the Woman's Relief Corps Home Association existed as a private corporation, it having been organized under the laws of the state. It is claimed by the attorney general that the act does not make the home a state institution, hence it is contended that the appropriation made by said act is in direct contravention of section 22 of article IV of the constitution. Said section, among other things, provides: ''. . . No money shall ever be appropriated or drawn from the state treasury for the use or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the state as a state institution, nor shall any grant or donation of property ever be made thereto by the state; *provided,* that, notwithstanding anything contained in this or any other section of this constitution, the legislature shall have the power to grant aid to institutions conducted for the support and maintenance of minor orphans, or half orphans, or abandoned children, or aged persons in indigent circumstances—such aid to be granted by a uniform rule, and proportioned to the number of inmates of such respective institutions.''

It will be observed that the first part of the foregoing provision of the constitution prohibits the legislature from making appropriations for the use of corporations, etc., not under the exclusive control of the state as state institutions; while the latter part expressly excepts from the operation of said provision institutions having the care, maintenance and support of minor orphans, half-orphans, abandoned children,

and aged persons in indigent circumstances, although such institutions are not under the exclusive management and control of the state as state institutions.

It is contended by the respondent that the Woman's Relief Corps Home is still a private corporation, notwithstanding the provisions of the act of 1897 (Stats. 1897, p. 447), purporting to place the home under the control of the state as a state institution; that the legislature, assuming the act in question to involve the exercise of competent legislative power, has utterly failed to make it a state institution, etc. We are unable to agree with the learned attorney general in this contention.

In 1889, the legislature made an appropriation of $25,000, of which $10,000 were to be expended in the construction of buildings, and $15,000 for the support of the widows, wives, etc., of veterans and army nurses in indigent circumstances who were or were to become inmates of the home so provided for. At that time the home was a private corporation; but the circumstance of the making of said appropriation by the legislature is important here in determining whether the legislature, by the act under consideration, intended to make the home a state institution, to be under the exclusive management and control of the state. By that act (Stats. 1889, p. 418), it was made manifest that the legislative department of the state government recognized, as the federal government had already done for itself, the duty of contributing toward the support and maintenance of such of those citizens as might require it who fought the battles of their country when the dark clouds of Civil War enveloped it and threatened the destruction of its constitution and its institutions. To carry out this policy, founded in a strong moral duty, it was, of course, necessary that there should be legislation, and that whatever legislation might be required should be enacted, if it could be done, in accordance with the commands and the terms of the constitution of the state. In 1897 the legislature, in pursuance of this policy, passed the law, the constitutional validity of which is questioned in this proceeding.

That the legislature by the last-mentioned act intended to adopt the Woman's Relief Corps Home Association as a state institution, of which it intended that the state should exercise exclusive management and control, I do not entertain the slightest doubt. The act provides, as seen, for the appoint-

ment of a board of directors of said home by the governor of the state. It provides that the executive shall fill by appointment all vacancies occurring in the board of directors from whatever cause. It requires the board and other officers to keep an account of its receipts of money and of all expenditures, and provides that no money shall be drawn on the fund established by legislative appropriation for its support or the support of its inmates except it be done in the manner authorized by law for the payment of all other claims against the state. It provides that a verified report, containing a statement of the receipts and expenses of the home and the condition thereof, etc., shall be by the board of directors transmitted to the governor on the fifteenth day of August of each year. The governor is given by the act the power to remove any director for cause. I cannot perceive how the legislature could have more plainly demonstrated its intention to make the home a state institution, as much under the control and supervision of the state as are the state hospitals and other like institutions, than by the provisions to which I have just referred. It is true that there is no language in the act expressly declaring the home to be a state institution, or that its management and control shall be exclusively vested in the state. But I do not apprehend that, in order to make it so, it must be specifically labeled as such. It is sufficiently known by the clothes that it wears. The single fact that the power of the removal of a director is placed by the act with the executive of the state is itself plainly indicative of the intention of the legislature to make it a state institution *under the exclusive management and control of the state.* The other provisions of the act emphasize this intention. The legislature found in the home a mere private corporation, organized under the laws of the state for eleemosynary purposes, and by an act deprived it of the character of a private corporation by impressing it with all the essential qualities of a state institution. The very argument of the attorney general tends to establish the soundness of this proposition, for he correctly declares that, if the home still remains a private corporation, the mode of appointing the directors authorized by the act would be in conflict with the thirty-third subdivision of section 25 of article IV of the constitution, providing that the legislature shall not pass local or special laws in cases where a general law can be made applicable. It is not to be as-

sumed that the legislature would deliberately attempt to invalidate a private corporation, already *duly* organized according to the laws of the state, by annexing to it a mode of selecting its directors plainly and palpably in violation of the requirements of the constitution. It will .no doubt be conceded that the constitution contains no language prohibiting the legislature from converting a private corporation into a state institution and placing it under the exclusive management and control of the state, provided, of course, that the purposes sought to be achieved by such corporation are within the general legislative power or involve some duty or function of government. (*Melvin* v. *State,* 121 Cal. 16, [55 Pac. 416].)

In dismissing this point I feel no reluctance in confessing that, if the language of the statute under consideration does not make the home a state institution under the exclusive management and control of the state, within the meaning of section 22 of article IV of the constitution, then I am at a loss to understand what the legislature meant or intended to accomplish by the enactment of the law. For the. purposes of the discussion of this point, I have assumed, as before observed, that the legislature possesses the constitutional right and power to establish the *home as a state institution*—a proposition, the consideration of which I now approach fully sensible of its great importance, both as to the legal questions involved as well as to the significance of the consequences of the decision, whatever it may be.

If, on the one hand, it should be found necessary to declare that the act under review represents an exercise of unauthorized power by the legislature, the effect of such decision will react not alone upon the institution here involved, but will, .of necessity, operate upon and destroy, as a state institution, the veteran's home for United States soldiers and sailors, at Yountville, this state, the same having been established and declared a state institution by the legislature of 1889. (Stats. 1889, p. 418.) The two institutions must stand or fall upon the same identical principles. On the other hand, the provisions of the constitution cannot be lightly brushed aside because certain persons or set of persons may, to some extent, suffer by their proper enforcement. They should, of course, be. enforced, as it was intended that they should be, without regard to the consequences which may follow such enforcement.

Among the provisions of the constitution to which the attorney general insists that the act in question is repugnant are the following: ". . . Nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." (Art. I, sec. 21.)

2. "The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: . . . Granting to any corporation, association or individual any special or exclusive right, privilege or immunity." (Art. IV, sec. 25, subd. 19.)

3. ". . . Nor shall it (the legislature) have power to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever." (Art. IV, sec. 31.)

The foregoing provisions, it is claimed, were disregarded by the legislature in the enactment of this law. To uphold the enactment, it is urged, the courts must close their eyes to the plain mandates of the constitution.

The attorney general argues that the purposes of the home are entirely nongovernmental, and that it is in excess of the power of the legislature to convert or undertake to transform such a corporation into a state institution, or place it as such under the exclusive management and control of the state; that the mere fact that the legislature has attempted to invest it with the character of a state institution does not necessarily make it so, since only those institutions which are the instruments through which some governmental functions are to be performed can the legislature make state institutions under the exclusive management and control of the state. Therefore, it is argued, an appropriation of money by the legislature for the use and benefit of such an "institution" would amount to a gift contrary to the provisions of section 31 of article IV of the constitution. This position, if the premise be well founded, would perhaps be sound. And it is further contended that even if the objects of the home are germane to the functions of government, and are therefore within the legislative power, the legislation involved in the act is special, and consequently, unconstitutional, because it does not apply "equally to all persons embraced in a class *founded upon some natural or intrinsic or constitutional distinction." (Pasadena* v. *Stimson,* 91 Cal. 251, [27 Pac.

604]; *Darcy* v. *Mayor of San Jose,* 104 Cal. 642, [38 Pac. 500]; *Marsh* v. *Supervisors,* 111 Cal. 372, [42 Pac. 975]; *Ex parte Jentzsch,* 112 Cal. 468, [44 Pac. 803]; *Johnson* v. *Goodyear Mining Co.,* 127 Cal. 4, [78 Am. St. Rep. 17, 59 Pac. 304].) In other words, it is claimed that the act attempts to provide for the care of certain persons arbitrarily selected from the body of the people.

As a matter of course, no one will dispute the proposition that the support of paupers and the giving of assistance to those who, by reason of age, infirmity or disability, or inability for any reason to take care of themselves, might become such, is, by the practice and common consent of civilized countries, a public purpose, and within the general legislative power. As is said by Judge Cooley, in his work on "Taxation," page 205, speaking of the establishment of hospitals where dependent classes can receive medical aid and assistance, asylums where the deaf, the dumb and the blind may be supported and taught, and where the insane may be kept from doing or receiving harm, and can have such careful and scientific treatment, with a view to their restoration, as they would not be likely to receive elsewhere: "He would be a bold man who, in these days, should question the public right to make provision for these benevolent purposes." There is, of course, no question raised here of the right and duty of the state to provide for those who, through physical or mental disability, are unable to provide for themselves; but the power sought to be exercised by the act under consideration is the same as the power spoken of by Judge Cooley, although such legislation, when applied to the persons concerned here, proceeds less upon the principle of benevolence than upon the consideration that aid accorded by the state to those who defended and preserved the governments of our country, when, as supposed to have been originally constituted, they were threatened with complete annihilation, is rather in the nature of *some* reward for a service, the value of which can scarcely be estimated. The general scheme and the paramount purpose of the act appear to be the establishment of a refuge or a permanent home, where the comforts of home-life may, to some extent, be had, for the ex-army nurses and certain relatives of ex-Union soldiers, who served honorably in the Civil War, who are unable to provide homes for themselves. Section 8 provides that "no inmate for whose support there is

paid, *independent of state aid,* the sum of twelve dollars and fifty cents or more per month; shall be entitled to any aid under this Act. But if such sum be less than twelve dollars and fifty cents per month, aid shall be granted for such sum only as is necessary to make the full amount for support, including the state aid, twelve dollars and fifty cents per month.'' (Stats. 1897, p. 449.) By this provision of the act it is made perfectly clear that only such persons as have no income whatever or who have an income not equal to the sum of $12.50 per month shall receive any financial aid from the appropriation provided for by the act.

Of course, as already shown, ex-Union soldiers and their families, if in a condition in which, by reason of old age or other physical disability, they are unable to properly take care of themselves, and are without means with which to provide for their proper care and support, and there are no relatives financially able, who are obligated by the law to contribute to their support and care, would be entitled to be supported and maintained at the expense of the public under the general duty and power of the state government to support paupers and those who are likely to become such for the reasons stated. In other words, the persons provided for by the act here, being unable to take care of themselves, would be entitled to be cared for by the public in *some form,* and the power is, therefore, vested in the legislature to make some sort of provision for them. From this it of course follows that the contention of the respondent that the appropriation provided for by said act amounts to a gift within the meaning of section 31 of article IV of the constitution cannot be sustained. (See case of *Yosemite Stage etc. Co.* v. *Dunn,* 83 Cal. 265, [23 Pac. 269], as to what constitutes a gift within the purview of said provision of the constitution.) The only question, then, is, Has the legislature, by the *manner* in which it has exercised or attempted to exercise its right to provide for the care and support of the persons eligible to become inmates of the home, violated any other of the provisions of the constitution?

At the outset, it may be conceded that the act in question is a special law, because it provides only for certain members of what I regard as a class within the definition of that term as given by the supreme court in the cases of *Pasadena*

v. *Stimson,* 91 Cal. 251, [27 Pac. 604]; *Darcy* v. *Mayor of San Jose,* 104 Cal. 642, [38 Pac. 500]; *Marsh* v. *Supervisors,* 111 Cal. 372, [43 Pac. 975]; *Ex parte Jentzsch,* 112 Cal. 372, [44 Pac. 803], and *Johnson* v. *Goodyear Mining Co.,* 127 Cal. 4, [78 Am. St. Rep. 17, 59 Pac. 304]. In other words, I am of the opinion that the veterans of the Civil War constitute a class founded upon a natural distinction—that is, a distinction arising in the very nature of things. In one of the opinions to which I have referred it is said that the distinction must be founded upon differences which are either defined by the constitution or natural, and which will suggest a reason which might rationally be held to justify the diversity of legislation. Or as I understand it, a distinction founded upon the necessity of legislation peculiarly applicable to a particular set of persons who are distinguished from the general body of the people by reason of the possession of some exclusive characteristic or characteristics, common to such set of persons. The "exclusive characteristic" possessed by the veterans of the Civil War consists in the peculiar and extraordinary service performed by them in the defense and preservation of the government of the Union as well as of the governments of the states when those governments were threatened with destruction.

The act under consideration is, as stated, a special law, for the reason that its provisions do not, and by their terms cannot, apply to and operate equally upon all belonging to the class to which the persons concerned here belong. That is to say, conceding, as I think must be done, that the relatives of the Civil War veterans and the ex-army nurses provided for by the act are members of the class to which the veterans themselves belong, the legislation under attack here is, obviously, designed to operate upon and benefit only a certain portion of said class. The question, therefore, to be determined is, Has the legislature constitutional power to enact a law especially applicable to the persons concerned here?

It is a fact, of which the courts may take judicial notice, that almost immediately after the close of the Civil War, the national government, through its Congress, recognized it to be the duty of the public to take *special* care of those who, through the most exalted motives of patriotism, devoted themselves to their country's cause, in a civil conflict which meant,

if not victorious for the Union, absolute destruction to the principles of government enunciated by the federal constitution, as the provisions of that instrument were construed by the master minds of Judge Marshall, Webster and other distinguished adherents of the school of broad construction. To execute this duty Congress passed laws pensioning ex-Union soldiers and otherwise providing for their care, support and maintenance, in all cases of disability from any cause engendered while in the service of the country. Thus Congress established this duty as a policy of the federal government. It must be borne in mind that the government of the Union is one of delegated powers, with no right or authority to exercise any but the express powers granted to it, and such implied powers as may be necessary to carry out and execute the former. There is no express provision in the federal constitution, to which my attention has been called, authorizing the appropriation of public moneys for the pensioning of soldiers who fought to preserve the Union, and it certainly must be admitted that it would require a severe stretch of the imagination to hold that an implied power to do so may be found in the provisions of that instrument authorizing Congress "to declare war," etc., and "to raise and support armies," etc. Nevertheless, Congress *has* exercised the right to give such aid to ex-Union soldiers, and whatever may be its authority for doing so, whether under a claimed implied or incidental power, or upon the principle of a paramount, overruling duty, the courts have sustained the legislation. (*Frisbie* v. *United States,* 157 U. S. 160, [15 Sup. Ct. Rep. 586]; *Walton* v. *Cotton,* 19 How. (U. S.) 355; *United States* v. *Fairchild,* Fed. Cas. No. 15,067.)

There may be no impropriety in suggesting, however, that it is doubtful if much higher authority ought to be required for such legislation by both the nation and the states than is to be found in these memorable words used by the immortal Lincoln in his second inaugural address: "With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, *to care for him who shall have borne the battle and for his widow and his orphan,* to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations."

Nor can I conceive any rational ground for holding that the states, if disposed to exercise the right, should not contribute toward the support and maintenance of these worthy persons in need of assistance. The moral duty to do so undoubtedly rests upon both the federal and state governments, and if there be any difference as to the responsibility of discharging such duty as between the two governments, it is only in degree and not in principle. It is only a question of whether the states will recognize this duty by the enactment of appropriate legislation for its performance. It is a familiar historical fact that the loyal states, acting through their governors, and responding to the call for troops from the government at Washington, drafted into the service of our common country in the Civil War certain of the citizens of such states who made up the great armies which won for the states as well as for the Union on the battle-fields what could not be won in the great council halls of the nation. The perpetuity of the states, as members of an unbroken Union, was as much at stake as was the maintenance of the Union itself. The states, governed under their present system, could not, of course, have survived if the war had resulted in the establishment of the right of secession. The state of California has, as is shown by the legislation which has from time to time been enacted by its legislature, adopted as a policy of the state government the duty of contributing toward the support and maintenance of the veterans of the Civil War and their families who are unable, by reason of physical disability, to support and maintain themselves. And are there not sound and unimpeachable reasons for caring for and supporting these persons in a manner different from the mode adopted for the care and maintenance of that class who have no other claim upon the bounty of the government than that they are without ability, physical or financial, to provide for themselves? It surely could not have been intended by the constitution makers that the legislature should be powerless, in the treatment of these war veterans or their families, in need of help, to provide for their care and support except under the general power providing aid for those coming within the category of paupers, or other needy persons who, from physical disability, are apt to become such. The service which these veterans performed not only distinguishes them as a class

from the general body of citizens, but necessarily differentiates them from the members of the other class entitled to the public bounty because they have not the ability to care for themselves. The principle upon which the government should recognize its duty to provide for the veterans of our wars, with whose personal destinies those of the persons concerned here were and are inseparably linked, is a higher and broader one than that which inspires the public duty to care for the other class. For, the idea that those who have performed such extraordinary service for the government, when its preservation depended entirely upon such service, should be succored in times of need under the category of paupers or of those who would become paupers but for aid from the public bounty, is intolerable, and so abhorent to a profound, patriotic sense of gratitude and the sentiments and principles of a justly grateful people, that there is hardly reasonable ground for the assumption that the framers of our fundamental law ever intended that the legislative power should be so circumscribed as to prevent legislation appropriately expressive of the great debt of honor due from the state to those loyal defenders of our common country.

Nor is it to be said that such legislation is altogether in the nature of compensation for services performed. The highest and fullest compensation for these great services consists in the realization by themselves as well as by their countrymen of the fruition of their patriotic, dauntless and eminently successful efforts to preserve the Union. Indeed, as I have before suggested, the value of such services cannot be measured by any known standard by which the value of human activities may ordinarily be determined. It involves no mere figure of speech to say that the soldiers who battled to make this a united country, and the federal constitution the supreme law of the land, are the saviors of our country. They became such not because they expected reward founded upon a money or commercial basis, but because of high patriotic motives, founded in a firm and impregnable belief in the indissolubility of the Union under the terms of the constitution given us by our fathers. The service thus performed was, as before observed, a peculiar service, for the reason that it was an extraordinary governmental service, called out only because of the exigencies of overruling neces-

sity.  Thus it is essentially different from the ordinary service involved in the civil administration of the affairs of government.  Therefore, I think, that those who performed that extraordinary service for the government constitute a class, distinguished by a line clearly segregating them not only from the general body of the people, but also from that other class entitled to be cared for, supported and maintained at public expense.  The consequence of these views is that, in the recognition of its moral duty to aid these persons when they need such assistance, the state has the right, through its legislature, to enact laws upon the subject whose provisions are peculiarly applicable to them as a class, and that such laws, if operative upon all members of such class, do not offend the constitutional injunction that ''all laws of a general nature shall have a uniform operation.''

But, since it is patent, as before observed, that this act is not designed to apply to all belonging to said class, and, as it is manifest that a general law could not be made applicable in the case here, it is nevertheless within the constitutional power of the legislature to enact special legislation to meet the peculiar circumstances of the case.  It must at all times be kept in mind that the subject to which this legislation relates is one as to which the legislature, under its general power, has the right to legislate.

It is true that the legislation pertains to a *duty,* the performance of which is a matter which primarily rests entirely in the discretion of the legislature.  It is different from such duties as are expressly commanded by the constitution to be performed by the legislature.  It is, as I have attempted to show, a moral duty which the legislature may or may not discharge.  But it is a duty which, in my opinion, it ought to assume.  As I have before stated, the difficulty in the legislative solution of the proposition lies in the problem of *how* or *in what manner* the legislature may exercise its right to grant aid to the persons concerned.  As previously observed, I believe it has the undoubted right to do so in a manner different from that within its general power to give public assistance to paupers and others unable, by reason of disability of some sort, to take care of themselves.

By subdivision 33 of section 25 of article IV of the constitution it is provided (negatively, it may be) and the su-

preme court, construing that subdivision of said section, has held, that in all cases where a general law cannot be made applicable, the legislature is authorized to pass a special law for the purpose of meeting the exigencies of the particular case. (*People* v. *McFadden,* 81 Cal. 498, [15 Am. St. Rep. 66, 22 Pac. 581]; *People* v. *Mullender,* 132 Cal. 221, [64 Pac. 299].)   Said section 25 of article IV of the constitution, after enumerating thirty-two subjects upon which local and special legislation is prohibited, provides: ". . . 33. In all other cases where a general law can be made applicable." In the Mullender case, *supra,* the supreme court says: "That the act here in question is both local and special is conceded. But that is not conclusive. The language of said paragraph (referring to the thirty-third subdivision of section 25, article IV, *supra*), plainly implies that there are or may be cases where a local or special act may be wise, salutary, and appropriate, and in no wise promotive of those evils which result from a general and indiscriminate resort to local and special legislation. The constitution submits the question, whether a general law can be made applicable in any given case, to the judgment of the legislature, to be determined in the light of the evils intended to be avoided, and with its determination upon that question we may not interfere, unless the disregard of the constitutional requirement is clear and palpable. In Indiana it is held that the legislature is the exclusive judge whether a general law can be made applicable. (Citing *State* v. *Tucker,* 46 Ind. 358, and cases therein cited.) In Iowa it is held that where a local or special law is not within the evil which the constitution sought to provide against, or where the enactment of a general law would not afford any remedy for or relief from that evil, such local or special law is valid." (Citing *State* v. *Squires,* 26 Iowa, 340, 345; see, also, *State* v. *Hitchcock,* 1 Kan. 178, 185, [81 Am. Dec. 503], and *Farrelly* v. *Cole,* 60 Kan. 375, [56 Pac. 492].)

From the foregoing interpretation of the power of the legislature under the thirty-third subdivision of section 25 of article IV of the constitution, and from the views heretofore ventured in this opinion as to the right of the legislature to grant aid in *some form* to the persons interested in this act, it follows that the law-making branch of the state government, in the exercise of the discretion committed to it by

said thirty-third subdivision of said section and article of the constitution, has not transcended its constitutional power in providing for these persons through a special law. For it is plain to be seen that a general law cannot be made to apply. Unless it appears clear that the constitution has been violated, this legislative determination **is**, under the decisions, conclusive upon the courts, and the right to pass a special law to meet the circumstances of the case is authorized under the doctrine of those decisions. The law under attack in the Mullender case, *supra,* established a state board of harbor commissioners for the bay of San Diego. Said law does not refer or apply to any of the other harbors within the state, and it involves, essentially, by the scope and very nature of its provisions, local and special legislation. It was sustained by the supreme court as a species of local and special legislation authorized by the subdivision of the section and article of the constitution referred to. I conclude that, for the reasons stated, the act here, though involving special legislation, is justified and authorized by the constitution.

But, in addition to the foregoing considerations, it may be suggested that the legislation here could well be sustained upon the principle upon which the legislatures of the states have often conferred upon municipalities, for instance, the right to appropriate money for the purpose of commemorating the anniversary of important events in the history of our country, as, for illustration, the Fourth of July. Referring to those cases in other jurisdictions in which such appropriations of municipal funds have been held to be not warranted, only for the reason, however, that the power to do so had not been expressly conferred by the legislature upon such municipalities, the supreme court, in the case of *Daggett* v. *Colgan,* 92 Cal. 59, [27 Am. St. Rep. 95, 28 Pac. 53], in a well-considered opinion by United States District Judge De Haven, then a member of our supreme court, says: "But it has never been doubted that the state could confer upon a city or town the authority to celebrate such important events in the history of the country as an appeal to the patriotism or higher sentiments of the people, and to tax their citizens to pay the expense thereof. . . . These cases are authority for the proposition that the state itself, unless restrained by its constitution, has the power to make appropriations for such purposes,

because unless it possesses the power, it could not confer it upon its municipal corporations. Such expenditures are justified under the general power which the state has to provide for the public welfare—the limits of which are perhaps not capable of exact definition—*and are the same in principle as appropriations made for the building of monuments to commemorate great historical events, or for the erection in public places of the statues of those who by common consent are classed among the patriots or benefactors of the nation."* (Italics ours.)

The principle underlying and sustaining the legislation referred to in the foregoing excerpt from said opinion is that from which the legislature deduces its right to pass laws authorizing the pensioning of police officers of certain cities of the state. Such legislation is founded upon the theory that to hold out such a reward to those engaged in certain branches of the public service, especially those branches in which the service required is beset by perils and danger to the lives and health of those performing it, has a tendency to enhance the efficiency of such service and is consequently in the interest of the public welfare. And the money appropriated for such purpose has been held by our supreme court not to be a gift of public money or the legislation authorizing it violative of any of the provisions of the constitution. (*Pennie v. Reis,* 80 Cal. 266, [22 Pac. 176].) Upon a similar principle Congress has assumed the right to pension the widows of former Presidents of the United States, as in the case of the widow of the lamented Garfield. It will not be denied that there is no language in the federal constitution from which it can even be implied that any such power is vested in Congress. Yet such appropriations of the public money are sustained by the common sentiment and patriotism of the whole country, and the right of Congress to make them, in proper cases, will never, in my opinion, be challenged so long as a vestige of gratitude remains in the people of the United States.

I have examined and considered the questions presented here *in extenso* and with painstaking care because, as before declared, I am deeply sensible of their importance and equally impressed with the conviction that an act of the legislature granting aid to the necessitous benefactors of our country

8 Cal. App.—35

and the relatives dependent upon them involves legislation for the benefit of the public weal and welfare and within the constitutional power of the legislature.

Such legislation adds strength and durability to the natural patriotism of the people, because it furnishes further proof that the institutions of the country for which they fought and for which others may be called upon to do battle are all that is claimed for them, and as they believed them to be when they willingly and patriotically made every sacrifice to sustain them.

The demurrer of the respondent, for the reasons stated in this opinion, is overruled, and a peremptory writ of mandate ordered in accordance with the prayer of the petition.

Chipman, P. J., concurred.

Burnett, J., concurred in the judgment.