[No. D037599. Fourth Dist., Div. One. June 10, 2003.]

CALIFORNIA ASSOCIATION OF RETAIL TOBACCONISTS et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents;
ROB REINER, Intervener and Respondent.

CIGARETTES CHEAPER! et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION et al., Defendants and Respondents;
ROB REINER, Intervener and Respondent.

798

**COUNSEL**

Bell, McAndrews, Hiltachk & Davidian, Charles H. Bell, Jr., Thomas W. Hiltachk, Ben Davidian; Gaglione, Coleman & Greene, Robert J. Gaglione and Jennifer L. Cusick for Plaintiffs and Appellants Cigarettes Cheaper! and The Customer Company.

Browne & Woods, Benjamin D. Scheibe, Eric M. George and Ira Bibbero for Plaintiffs and Appellants California Association of Retail Tobacconists, Inc., Charles Hennegen, JMG International, Inc., Santa Monica Cigar Company, Inc., Sherlock's Haven, Inc., John Boyd, Vaughn Boyd, G. Harold Hunt, Ellen M. Hunt, Marcus D. Morine, The Cigar Warehouse, Inc., Don Welsh, Macario Casillas, Douglas J. Shaw, Shawn K. Phillips, Michael J. Robbins, Jeanine Robbins, Tobacco Trader, Tobacco Loft, Ltd., Burlingame Tobacconists, Inc., Karl Kolpin, Manjit Bain and Jason Blanco.

Bill Lockyer, Attorney General, Lawrence K. Keethe, William L. Carter and Michael J. Cornez, Deputy Attorneys General, for Defendants and Respondents.

Remcho, Johansen & Purcell, Robin B. Johansen and James C. Harrison for Intervener and Respondent.

---

## OPINION

**McDONALD J.**—In these appeals we consider the constitutionality of Proposition 10, an initiative adopted by the electorate in November 1998, which enacted the California Children and Families Act of 1998 (the Act). The Act increased the tobacco excise tax for the stated purposes of reducing tobacco use, particularly among teenagers, and funded early child development and antismoking programs. It created the statewide California Children and Families Commission (CCFC) and local county commissions to administer its statutory mandates, and added section 130100 et seq. to the Health and Safety Code[1] and section 30131 et seq. to the Revenue and Taxation Code. The California Association of Retail Tobacconists, Inc., and over 20 retail tobacconists (collectively CART), and Cigarettes Cheaper! and the Customer Company (together CC) contend the Act violates the following provisions of the California Constitution:[2] the initiative single-subject limitation (art. II, § 8, subd. (d)); the prohibition on funding private corporations (art. II, § 12); the exclusive state management and control requirement (art. XVI, § 3); the prohibition against delegating the taxing power (art. XI, § 11, subd. (a)); the separation of powers (art. III); and the prohibition against constitutional revision by initiative (art. XVIII, §§ 1 & 2). Additionally, CART and CC assert that if we conclude the Act is facially constitutional, then the State Board of Equalization (Board) erroneously interpreted the interrelationship of the Act with Proposition 99, resulting in an invalid "double tax" on tobacco products other than cigarettes (referred to as "other tobacco products"), which makes the Act as interpreted unconstitutional. We conclude the Act is facially constitutional. We also conclude the trial court and the Board correctly interpreted the Act's effect on the taxation of other tobacco products without violating the single-subject limitation or equal protection of the laws and that the Act as interpreted is constitutional. We hold that following adoption of the Act the total excise tax on other tobacco products is permissibly no longer equivalent to the total excise tax on cigarettes. Accordingly, we affirm the judgment of the trial court that upheld the constitutionality of the Act.

---

[1]All statutory references are to the Health and Safety Code unless otherwise specified.
[2]All constitutional references are to the California Constitution unless otherwise specified.

I

### FACTUAL AND PROCEDURAL BACKGROUND

On November 3, 1998, the California voters adopted the Act. The Act declares a compelling need to promote, support and improve early child development, cites the relatively little amount being expended on early child development, and imposes a new excise tax on cigarettes and other tobacco products to alleviate that need. The tax revenue is funneled from the State Treasury to a newly created state commission, the CCFC, and county commissions for expenditure on a variety of services for children under the age of five. The Act addresses the issue of childhood well-being, especially its relationship to cigarette smoking and other tobacco use by pregnant women. The tax revenue finances the creation of a system of integrated and comprehensive parenting programs and related services. (Prop. 10, § 2.) As later amended, section 130100, subdivision (a) expressed the Act's purpose is "to facilitate the creation and implementation of an integrated, comprehensive, and collaborative system of information and services to enhance optimal early childhood development and to ensure that children are ready to enter school. This system should function as a network that promotes accessibility to all information and services from any entry point into the system. It is further the intent of this [A]ct to emphasize local decisionmaking, to provide for greater local flexibility in designing delivery systems, and to eliminate duplicate administrative systems." The Act amended the Constitution to exempt this new tax from the prohibition against new sales taxes and to exclude its proceeds from the Proposition 98 school-funding guarantee and the Gann Act. (Arts. XIII A, § 7, XIII B, § 13.)

The Act imposes on cigarette distributors a tax of 50 cents per pack (Rev. & Tax. Code, § 30131.2, subd. (a)), in addition to the 25 cents per pack tax imposed by Proposition 99 and the 12 cents per pack tax imposed by Revenue and Taxation Code section 30101. The Act also imposes a tax on distributors of other tobacco products at a rate equivalent to the 50 cents per pack tax imposed on cigarette distributors. (Rev. & Tax. Code, § 30131.2, subd. (b).) The tax on other tobacco products is in addition to the tax imposed by Proposition 99, which requires distributors of other tobacco products to pay a tax "equivalent to the combined rate of tax imposed on cigarettes by subdivision (a) and the other provisions of this part [part 13]." (Rev. & Tax. Code, § 30123, subd. (b).) Revenue generated by taxes imposed by the Act is deposited in "The Children and Families Trust Fund" in the State Treasury to be disbursed for programs the purposes of which are authorized to be funded by the Act. (§ 130105, subd. (a); Rev. & Tax. Code,

§ 30131.) Twenty percent of the tax revenue is distributed to the CCFC (§ 130105, subd. (d)), and the remainder is distributed among the county commissions (in proportion to the number of births in a county to the number of births in the state) for expenditure in accordance with each county's strategic plan (§§ 130105, subd. (d)(2), 130140). The revenue distributed to the CCFC is allocated to separate accounts for expenditure according to the following statutory formula: 6 percent for mass media communications involving early childhood development, the prevention of tobacco use by pregnant women and the detrimental effects of secondhand smoke on early child development; 5 percent for parental education training and technical assistance for the county commissions; 3 percent for child care programs; 3 percent for research and development of standards for early childhood development programs; 1 percent for administration; and the remaining 2 percent for any of the authorized purposes other than administration. (§ 130105, subd. (d)(1).)

The Act establishes the CCFC to administer the statewide program, and authorizes local commissions in all 58 counties of the state to administer county programs created under the statutory scheme. (§§ 130100, subd. (b), 130110, 130140.) The CCFC is composed of seven voting members: three (including the chairperson) appointed by the Governor, two appointed by the Speaker of the Assembly and two appointed by the Senate Rules Committee. Each member serves a fixed term, and no member may serve more than two 4-year terms. The Secretary of the California Health and Human Services Agency and the Secretary for Education, or their designees, serve as ex officio nonvoting members of the CCFC. (§§ 130110, 130115.) The CCFC is required to adopt guidelines to implement an integrated and comprehensive early childhood development program, which must address parental education and support services, child care, and child health care services, including prenatal and postnatal maternal health care services. (§ 130125, subd. (b)(1).) It must also provide technical assistance to county commissions in adopting and implementing county strategic plans for early child development, review their annual audits, and compile information about their activities in an annual report to the Governor, the Legislature and each county commission. (§§ 130125, subds. (f) & (g), 130150, subd. (b).)

The Act authorizes each county to establish a local county commission. To participate in this statewide program and to share in the tax revenue generated by the Act, the county board of supervisors must adopt an ordinance establishing a county commission consisting of five to nine members appointed by the board of supervisors. The county commission must also adopt a strategic plan consistent with the CCFC's guidelines for

supporting and improving early child development within the county. A county commission must conduct an annual audit and adopt an annual report. (§ 130140, subd. (a)(1).) A county commission may be either a legal public entity separate from the county or an agency of the county with independent authority over its strategic plan and the local trust fund established under section 130105. (§ 130140.1, subd. (a).) A county commission is authorized to employ personnel and to contract for personnel services; enter into contracts necessary to carry out the statutory mandates; acquire, possess and dispose of real or personal property; and sue or be sued. (§ 130140.1, subd. (b)(2).) The county is not responsible for the obligations of the county commission. (§ 130140.1, subd. (b)(4).)

In December 1998 the Board considered the interrelationship of the Act with Proposition 99, which was adopted by initiative effective January 1, 1989. The Board concluded that Proposition 99 set the tax rate on other tobacco products by referring to all cigarette taxes imposed under division 2, part 13 of the Revenue and Taxation Code, and because the Act is contained in part 13, the 50 cent per pack cigarette surtax of the Act is included in the calculation of the tax rate on other tobacco products under Proposition 99. Consequently, in May 1999, the Board set the 1999-2000 tax rate for other tobacco products at 66.5 percent of the wholesale cost, although the tax rate for cigarettes was 42.23 percent of the wholesale cost.

On October 27, 1999, Proposition 28 qualified for the March 7, 2000 ballot. That initiative, if adopted, would have repealed the taxes imposed by the Act and prevented the electorate from imposing an additional surtax on the distribution of cigarettes or other tobacco products. Proposition 28 was not adopted.

On January 6, 1999, CART filed a writ petition in the California Supreme Court to invalidate the Act. It argued that the initiative violated the California Constitution's single-subject rule, prohibition against naming a private entity in an initiative, and prohibition against appropriating public funds to an institution not under the exclusive management and control of the state. The Supreme Court denied the petition.

On June 28 CART filed this tax refund action in the San Diego County Superior Court and CC filed a similar action for declaratory and injunctive relief and damages in the Sacramento County Superior Court. By their amended complaints, both CART and CC challenged the constitutionality of the Act. Each contended the Act violated the California Constitution's single-subject rule, prohibition against naming a private entity in an initiative, prohibition against appropriating funds to an institution not under the

exclusive management and control of the state, and other constitutional provisions. Each also argued the Board improperly interpreted the Act and Proposition 99 to result in a tax rate on other tobacco products impermissibly higher than the tax rate on cigarettes. On November 12, McLane/Suneast, Inc., and United States Tobacco Sales and Marketing Co., Inc. (collectively McLane), filed a tax refund suit in the Los Angeles County Superior Court. McLane argued that the Board incorrectly interpreted the tobacco tax provisions of the Act and Proposition 99 and that the Act, as interpreted, violated the equal protection clause of the state and federal Constitutions and the single-subject rule of the state Constitution. The courts permitted CCFC Chairman Rob Reiner to intervene in all actions. On March 15, 2000, the CC and McLane actions were transferred to the San Diego County Superior Court and consolidated with the CART case for all purposes.

On September 15 this consolidated action proceeded to trial, during which the trial court heard testimony from 36 witnesses and admitted numerous exhibits into evidence. On November 15 the trial concluded with the trial court's oral and written statement of decision. On December 7, the trial court issued a 50-page final statement of decision and on January 9, 2001, entered a judgment for the defendants. The trial court concluded each of the proffered constitutional challenges was unpersuasive and the Act is constitutional. The court also concluded the Act did not impose an illegal "double tax" on other tobacco products and the Board correctly interpreted the Act's interrelationship with Proposition 99. CART, CC, and McLane filed timely notices of appeal; however, McLane dismissed its appeal after filing its opening brief.

## II

### STANDARD OF REVIEW

These appeals present constitutional issues that are questions of law and reviewed de novo. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10]; *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 549 [103 Cal.Rptr.2d 447].) This reviewing court therefore exercises its independent judgment, without deference to the trial court's ruling. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)

We are guided by established principles for evaluating the constitutionality of initiative measures. We do not consider or weigh the economic or social wisdom or general propriety of the initiative, but rather evaluate its

constitutionality in the context of established constitutional standards. (*Cal-farm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247].)

"Although the legislative power under our state Constitution is vested in the Legislature, 'the people reserve to themselves the powers of initiative and referendum.' [Citation.] Accordingly, the initiative power must be *liberally construed* to promote the democratic process. [Citation.] Indeed, it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise. [Citation.] As with statutes adopted by the Legislature, all presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citation.]" (*Legislature v. Eu* (1991) 54 Cal.3d 492, 500-501 [286 Cal.Rptr. 283, 816 P.2d 1309].)

III

THE SINGLE-SUBJECT RULE

CART and CC contend the Act violates the single-subject rule set forth in article II, section 8, subdivision (d) because: it addresses the separate subjects of early child development and tobacco consumption, which are sufficiently disparate to exceed the single-subject rule limitations; the subject of childhood development and health is excessively general; and the combination of increased tobacco taxation and child development programs consists of impermissible "logrolling" because it forces the electorate to vote for one to secure the other. The trial court concluded that all of the provisions of the Act are "reasonably germane" to the single subject of the improvement of the health of children from prenatal stage to age five and therefore the Act does not violate the single-subject rule. It noted the record includes evidence that the health of this demographic group is harmed by tobacco consumption by pregnant women and secondhand smoke. It found that the Act improves children's health by increasing tobacco taxes, which discourages consumption and reduces the harmful effects of tobacco consumption on children, and by raising revenue to be spent on improving the health and welfare of young children. We likewise conclude that the Act is an effort to promote the healthy development of young children, and its provisions are reasonably germane to that goal and are sufficiently functionally related to one another to satisfy the single-subject rule, under current California Supreme Court single-subject rule jurisprudence.

Article II, section 8, subdivision (d) provides that "[a]n initiative measure embracing more than one subject may not be submitted to the

electors or have any effect." The single-subject rule is designed to avoid voter confusion and to prevent subversion of the electorate's will. (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1156 [90 Cal.Rptr.2d 810, 988 P.2d 1089].) The most recent recitation of the single-subject rule by the Supreme Court states: " 'In articulating the proper standard to guide analysis in this context, the governing decisions establish that " ' "[a]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are 'reasonably germane'* to each other," and to the general purpose or object of the initiative.' " [Citation.] As we recently have explained, "the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose." [Citation.] Accordingly, we have upheld initiative measures " 'which fairly disclose *a reasonable and common sense relationship among their various components in furtherance of a common purpose.*' [Citation.]" [Citation.]' (*Senate of the State of Cal. v. Jones* [, *supra,*] 21 Cal.4th [at p.] 1157. . . .) The common purpose to which the initiative's various provisions relate, however, cannot be ' "so broad that a virtually unlimited array of provisions could be considered germane thereto and joined in this proposition, essentially obliterating the constitutional requirement." [Citation.]' (*Id.* at p. 1162[, original italics].)" (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 575 [117 Cal.Rptr.2d 168, 41 P.3d 3].) ▊ The single-subject requirement is not construed in an unduly narrow or restrictive manner to preclude the use of the initiative process to accomplish comprehensive, broad-based reform in particular areas of public concern. (*Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th at p. 1157.) Rather, the single-subject rule is interpreted liberally to uphold legislation that includes a matrix of reasonably germane elements. (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 38 [157 Cal.Rptr. 855, 599 P.2d 46].)

CART relies on case precedent invalidating proposed or approved statewide initiatives for violating the single-subject rule to support its position that the Act violates that rule.[3] CART contends the Act suffers the same constitutional infirmities as those precedents because it combines two unrelated disparate subjects without a narrow unifying theme: it combines a tax

---

[3]*Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th 1142 (holding proposed ballot initiative Prop. 24, the "Let the Voters Decide Act of 2000," that embraced two separate and unrelated subjects of the transfer of power of apportionment from the Legislature to the Supreme Court and the compensation of state legislators and officers violated the single-subject rule); *Chemical Specialties Manufacturers Assn., Inc. v. Deukmejian* (1991) 227 Cal.App.3d 663 [278 Cal.Rptr. 128] (holding Prop. 105, the "Public's Right to Know Act" that provided for disclosure requirements for advertising regarding household toxic products, seniors' health insurance, nursing homes, statewide initiative campaigns, and sales of stocks

on tobacco products designed to reduce consumption with the creation of a multitude of unrelated child development spending programs "that are so loose in purpose and design as to lack any cohesion." CART and CC assert there is no connection or reasonable relationship between the central purposes of the Act (developing, promoting and funding programs for early child development) and reducing the consumption of cigarettes and other tobacco products in California through increased taxes and educational programs. They argue that although the Act allocates and appropriates nearly all of the new taxes to a vast and virtually limitless array of early child development programs, it does not require either the CCFC or county commissions to spend any of the funds on antitobacco programs.

The electorate was advised that the primary goal of the Act is to improve the health of children from prenatal stage to age five. Uncodified section 2 of the Act advised the voters of the compelling need to create and implement an integrated system of information services to promote, support and optimize early childhood development from the prenatal stage to five years of age, and to ensure the continued availability of early childhood development programs and services. (Prop. 10, § 2, subds. (a), (b).) It advised the electorate that the well-being of California's infants and children is endangered by cigarette smoking and the consumption of other tobacco products by pregnant women and parents with young children, and that studies established smoking accounted for an estimated 20 to 30 percent of low birth weight babies, up to 14 percent of preterm deliveries and approximately 10 percent of infant deaths. (Prop. 10, § 2, subds. (i), (j).) Further, the Act recited studies showing secondhand smoke is responsible annually for between 150,000 and 300,000 lower respiratory tract infections in infants and children under 18 months of age, resulting in approximately 7,500 to 15,000 annual hospitalizations. (Prop. 10, § 2, subd. (*l*).) The Act further recited it would address these issues by: facilitating the creation of a system of integrated and comprehensive programs and services with a funding base and financial accountability, establishing community-based programs to provide parental education and family support services relevant to effective child development that include education and skills training in nurturing and avoiding tobacco, drugs, and alcohol during pregnancy (Prop. 10, § 2, subd. (m)(1)); educating the public on the benefits of nurturing, health care, family support and child care (Prop. 10, § 2, subd. (m)(2)); educating the public on the dangers of smoking and other tobacco use by pregnant women to

and securities in businesses involved in South Africa, violated the single-subject rule); *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351 [245 Cal.Rptr. 916] (holding a proposed ballot initiative, the "Insurance Cost Control Initiative of 1988," violated the single-subject rule).

themselves and to infants and young children, and the dangers of second-hand smoke to all children (Prop. 10, § 2, subd. (m)(3)); and encouraging pregnant women and parents of young children not to smoke cigarettes or use other tobacco products (Prop. 10, § 2, subd. (m)(4)). The Act then declared that "[a] 50-cent-per-pack increase in the state surtax on cigarettes and an equivalent increase in the state surtax on [other] tobacco products to fund anti-smoking and early childhood development programs is necessary, appropriate, and in the public interest." (Prop. 10, § 2, subd. (n).) The Act rationalized the increase in taxation by declaring that monies "spent now on well-coordinated programs that enable children to begin school healthy, ready and able to learn, and emotionally well developed will save billions of dollars in remedial programs, treatment services, social services, and our criminal justice system." (Prop. 10, § 2, subd. (h).)

The Act requires the CCFC to allocate 6 percent of the tax revenue generated under the Act for mass media communications regarding early child development, the prevention of tobacco use by pregnant women and the detrimental effects of secondhand smoke on early childhood development. (§ 130105, subd. (d)(1)(A).) It also requires the county commissions to spend the Act's tax revenue for the purposes authorized by the Act and consistent with their respective strategic plans. (§ 130105, subd. (d)(2)(A).) The county strategic plans must be consistent with CCFC guidelines (§ 130140, subd. (a)(1)(C)(i)), which must address parental education and support services, and provide child health care services related to tobacco avoidance (§ 130125, subd. (b)(1)(A) & (C)).

These components of the Act have a reasonable relationship to each other in furtherance of the Act's common purpose to improve the health and development of children from the prenatal stage to the age of five years. The various provisions of the Act are reasonably germane to each other and to that purpose because there is evidence the health of that demographic group is harmed by tobacco consumption[4] and the Act increases tobacco taxes to discourage consumption and reduce the harmful effects of that consumption on children while raising revenue to fund improvement of the health and

---

[4]Dr. David Burns, a University of California at San Diego School of Medicine professor, echoed the declarations and findings of the Act in his testimony regarding the harmful effects of tobacco products on pregnant women and their fetuses, as well as the harmful effects of secondhand smoke on young children. He further testified that children of parents who smoke are more likely to suffer from pneumonia, bronchitis, lung maturation delay, asthma, and chronic middle ear infections. Dr. Burns testified that tobacco use by pregnant women increases the risk of complications during pregnancy, spontaneous abortion, low birth weight babies, premature birth, and sudden infant death syndrome. Moreover, in comparison to the decline in smoking among older adults, he noted that in the past decade there has not been a substantive decline in cigarette smoking among young adults of childbearing years.

welfare of young children. Increasing the tax on tobacco products and partially directing the increased revenues to areas in which smoking has had significant negative effects is a coherent effort to achieve the stated objective of discouraging tobacco consumption and reducing its harmful effects on young children. (See *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 253-254 [279 Cal.Rptr. 325, 806 P.2d 1360].)

CART and CC assert the subject of childhood development and health is excessively general and permits a virtually unlimited array of programs that could be considered germane to each other, thus exceeding the constitutional limitation to a single subject. However, unlike the amorphous subjects or common themes of *voter approval* and *public disclosure* held to be excessively general in *Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th 1142 and *Chemical Specialties Manufacturers Assn., Inc. v. Deukmejian, supra,* 227 Cal.App.3d 663, on which CART and CC rely (see fn. 3, *ante*), the purpose or subject of promoting early child development from the prenatal stage to the age of five by establishing an integrated, comprehensive and collaborative system of information services designed to enhance optimal early childhood development is sufficiently focused and specific in character. The Act is as narrowly focused as measures that have been upheld against a single-subject constitutional challenge. (See, e.g., *Manduley v. Superior Court, supra,* 27 Cal.4th at pp. 573-581 [Prop. 21 addressing gang-related crime, the juvenile justice system and recidivism sentencing within the context of the problem of violent crime committed by juveniles and gangs]; *Legislature v. Eu, supra,* 54 Cal.3d at pp. 512-514 [Prop. 140, the Political Reform Act of 1990, addressing term limits, budget limits and pension limits within the context of the subject of "incumbency reform"]; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 342-349 [276 Cal.Rptr. 326, 801 P.2d 1077] [Prop. 115, the Crime Victim's Justice Reform Act, addressing postindictment preliminary hearings, independent construction of state constitutional criminal rights, speedy trials, joinder/severance of criminal cases, hearsay testimony at preliminary hearings, discovery procedures, voir dire examination, felony-murder statute, special circumstances, torture, appointment of counsel, and trial dates and continuances within the context of a comprehensive criminal justice reform act designed to promote the rights of actual and potential crime victims]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 242-253 [186 Cal.Rptr. 30, 651 P.2d 274] [Prop. 8, the Victims' Bill of Rights, addressing restitution, safe public schools, truth-in-evidence, bail, prior convictions, criminal defenses, habitual criminals, victims' statements, plea bargaining, sentencing to the youth authority, and mentally disordered sex offenders, again within the context of a comprehensive criminal justice reform package focused on promoting the rights of actual and potential

crime victims]; *Fair Political Practices Com. v. Superior Court, supra,* 25 Cal.3d at pp. 37-43 [Prop. 9, the Political Reform Act of 1974, addressing elections, campaigns, lobbyists, conflicts of interest and voter pamphlets within the context of the subject of "political practices"].)

In *Kennedy Wholesale, Inc. v. State Bd. of Equalization, supra,* 53 Cal.3d at pages 253-255, the Supreme Court upheld the constitutionality of Proposition 99 against a single-subject challenge that it did not guarantee every expenditure of revenue generated by the increased tax on tobacco products would be related to tobacco use. Under Proposition 99, the tobacco tax revenue is deposited into a Cigarette and Tobacco Products Surtax Fund. (Rev. & Tax. Code, § 30122, subd. (a).) By statute, revenue appropriated from that fund must be used for various tobacco-related purposes, but also for: "[m]edical and hospital care and treatment of patients who cannot afford to pay for those services, and for whom payment will not be made through any private coverage or by any program funded in whole or in part by the federal government[; and] [p]rograms for fire prevention; environmental conservation; protection, restoration, enhancement, and maintenance of fish, waterfowl, and wildlife habitat areas; and enhancement of state and local park and recreation purposes." (*Id.,* subd. (a)(3) & (4).) Consequently, tax revenue generated under Proposition 99 may be spent to assist indigent medical patients whose health problems are not related to smoking, and to improve state parks and wildlife habitat areas that have not been damaged by fire. Nevertheless, the Supreme Court held Proposition 99 did not violate the single-subject rule, reasoning that the measure's spending provisions directed some revenues more precisely to tobacco-related problems than if the electorate had simply omitted any provisions directing expenditure of the funds. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization, supra,* 53 Cal.3d at p. 254.) The Supreme Court simply added: "We do not believe the voters' failure to require even greater precision invalidates the measure, since it is well established that an initiative may have 'collateral effects' without violating the single-subject rule. [Citations.]" (*Id.* at pp. 254-255.)

Comparatively, the Act and Proposition 99 impose a tax on tobacco products, consist of elements reasonably germane to each other, deposit tax revenue into specific funds and appropriate revenue for use to meet desired objectives that are largely tobacco-related. Although there appears to be no relationship between Proposition 99 tobacco tax revenue and state parks, non-smoking-related fire prevention, environmental conservation, wildlife habitat protection and non-smoking-related indigent medical care, the Act's tobacco tax revenue can be related to every early childhood development program funded by the Act because parental smoking and secondhand smoke

in general have an arguably negative impact on a child's early development. Unlike Proposition 99, the Act requires the additional tobacco tax revenue generated be spent on a specific demographic group whose health and welfare is harmed by parental smoking and secondhand smoke. Under current Supreme Court single-subject rule jurisprudence the Act does not violate the single-subject rule.[5]

Because we conclude that the Act does not violate the single-subject rule, there is no separate constitutional basis for the claim of logrolling, which is a factor in considering whether an initiative violates the single-subject limitation by combining disparate subjects not reasonably germane to each other. ■ "The single-subject rule is the method by which the state Constitution guards against that hazard. Moreover, we have consistently held that the single-subject rule does not require a showing that each one of a measure's several provisions was capable of gaining voter approval independently of the remaining provisions. [Citations.] The possibility that some voters objected to some parts of a measure, as we have previously explained, 'is inherent in any initiative containing more than one sentence . . . . The enactment of laws whether by the Legislature or by the voters in the last analysis always presents the issue whether on balance the proposed act's benefits exceed its shortcomings.' [Citation.]" (*Kennedy Wholesale, Inc. v. State Bd. of Equalization, supra,* 53 Cal.3d at p. 255; see *Manduley v. Superior Court, supra,* 27 Cal.4th at p. 579, fn. 12.)

## IV

### PROHIBITION OF STATE FUNDING OF ENTITIES OUTSIDE OF THE STATE'S EXCLUSIVE MANAGEMENT AND CONTROL

■ CART and CC contend that the CCFC and county commissions established by the Act annually receive revenue from the state treasury to spend on a limitless array of early childhood development programs, but are not under the exclusive management and control of the state in violation of

---

[5]The suggestion that the Act violates the single-subject rule because it triggers an increase in the tax on other tobacco products imposed by Proposition 99 to fund Proposition 99 antitobacco programs allegedly unrelated to the Act's focus on improving the health and welfare of young children is unpersuasive. The additional equivalent 50-cent tax on other tobacco products is the result of preexisting law enacted by Proposition 99, not the Act. Nevertheless, even were it a result of the Act, it amounts to a collateral effect consistent with section 130105, subdivision (c) that protects Proposition 99 health-related education and research programs, but not health care and resources programs, from a loss of funding caused by decreased consumption. Moreover, any measure increasing tobacco taxation discourages consumption and thus improves the health and welfare of young children.

article XVI, section 3.[6] They assert that the executive and legislative controls normally exercised by the Governor and the Legislature over state agencies are "missing in action" here. They argue that the Legislature's controls of appropriating funds and establishing spending priorities and the Governor's executive branch budgetary and management controls do not exist under the Act's CCFC and county commission structure. The trial court rejected this contention, concluding the CCFC and county commissions share essential characteristics with other governmental agencies and commissions that have withstood constitutional challenge, including funding from a continuous stream of appropriations, the conferral of broad discretion to determine how to accomplish goals specified by the electorate or the Legislature, and limiting membership on the commissions to elected public officials and/or their appointees. The trial court also found: the commissions are subject to various external checks, balances and controls as well as oversight by other independent state agencies; the Act imposes constraints on the commissions' spending of revenue; the commissions are subject to annual independent financial audits as well as performance audits; and the commissions govern themselves in the same manner as other governmental agencies.

Article XVI, section 3 provides: "No money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a state institution, nor shall any grant or donation of property ever be made thereto by the State . . . ." ■ Although this constitutional prohibition was designed "to prevent the appropriation of the moneys of the state for any purpose other than that which pertains to the state" (*County of Sacramento v. Chambers, supra,* 33 Cal.App. at p. 146), it prohibits (qualified by only a few express exceptions)[7] the Legislature from making appropriations for the use of institutions not under the exclusive control of the state (*Board of Directors v. Nye* (1908) 8 Cal.App. 527, 531 [97 P. 208]). However, it was "not intended to unduly restrict the state in the expenditure of public funds for legitimate state purposes." (*People v. Honig* (1996) 48 Cal.App.4th 289, 352 [55 Cal.Rptr.2d 555].) "As with the constitutional prohibition against the gift of public funds

---

[6]CART and CC do not assert that the expenditures authorized by the Act do not serve a public purpose; they recognize it is the duty of the state to take all necessary steps to promote the health and comfort of its inhabitants (*County of Sacramento v. Chambers* (1917) 33 Cal.App. 142, 147 [164 P. 613]).

[7]Article XVI, section 3 expressly lists several exceptions where the Legislature may appropriate *unmanaged* funds, including whenever federal funds are made available for hospital construction by public agencies and nonprofit corporations organized to do so, to provide aid to orphanages proportional to the number of persons in any such institution, and to provide aid to needy blind persons and the disabled not inmates of any institution supported in whole or in part by the state or by any of its political subdivisions.

[article XVI, section 6,] article XVI, section 3, has been construed to be inapplicable to those cases in which private parties are benefited by state appropriations only as an incident to the promotion of a public purpose. [Citations.]" (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 586 [131 Cal.Rptr. 361, 551 P.2d 1193]; *Daggett v. Colgan* (1891) 92 Cal. 53, 56 [28 P. 51].) Article XVI, section 3 "reflects both the drafters' recognition of the need for charitable relief and their fear of inappropriate legislative largess. Its role is best understood in conjunction with section 5, which prohibits state support of religious organizations[;] section 6, which prohibits gifts of state funds for other than public purposes[;] and the later-enacted grants of charitable powers in sections 4, 11, and 13.

■ Thus, the first sentence generally forbids the [L]egislature [from appropriating] money for charitable institutions whenever that institution is not under the control of the state. Despite the apparent breadth of that prohibition, courts later excused its application [if] money was spent for a 'public purpose.' That phrase is modernly interpreted to allow state appropriations for a broad range of activities, thus removing many of the earlier restrictions on the types of entities that can receive state aid [citation]. As long as a private institution performs a public purpose, any benefit that it receives is merely incidental to the public benefit, and spending will be constitutional." (Grodin et al., The Cal. State Constitution: A Reference Guide (1993) pp. 280-281.) Consequently, article XVI, section 3 has been interpreted not to prohibit legislative authorization for some degree of autonomy in a government agency or innovation in the manner in which a government agency operates, but rather to prevent the appropriation of funds from the state fisc for a purpose foreign to the interests of the state and outside of its control.

The exclusive management and control condition evinces the constitutional concern that the appropriation of funds to autonomous entities independent of state controls may not always further legitimate state purposes and interests. This interpretation is consistent with the excerpts of the debates of the California Constitutional Convention in 1879, of which the trial court took judicial notice. That material shows that the Constitutional Convention delegates were concerned that even if a legitimate public purpose existed for the expenditure of taxpayer funds, those funds should generally be expended only on programs and services for which the state retained the ability to manage and control the delivery of those programs and services. (*Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 733 [68 Cal.Rptr.2d 239].)

■ Exclusive management and control of the state includes those elements of governance assigned to the executive and legislative branches.

The executive power includes the power of appointment, removal, supervision and management. The legislative power includes the power to appropriate funds and to establish spending priorities. (See *Board of Directors v. Nye, supra,* 8 Cal.App. at pp. 532-533; *People v. San Joaquin etc. Assoc.* (1907) 151 Cal. 797, 802-805 [91 P. 740].) Whether an entity is under the exclusive management and control of the state is determined through a case-specific evaluation of the applicable executive and legislative controls. (Cf. *Howard Jarvis Taxpayers' Assn. v. Fresno Metropolitan Projects Authority* (1995) 40 Cal.App.4th 1359, 1383-1388 [48 Cal.Rptr.2d 269] [inadequate controls—11 of 13 directors on the authority were chosen by private entities who have no public accountability; in all other respects the entity is "public," subject to the many miscellaneous statutory requirements and features of other state agencies]; *Board of Directors v. Nye, supra,* 8 Cal.App. at pp. 532-533 [adequate controls—Governor appoints directors, fills all vacancies and has the power to remove a director for cause; the entity is required to keep an accounting and submit an annual verified report to the Governor and the State Board of Examiners for audit; and the appropriation of funds and their use is retained by the Legislature]; *People v. San Joaquin etc. Assoc., supra,* 151 Cal. at pp. 802-805 [adequate controls—Governor appoints district agricultural board members to fixed four-year terms and fills vacancies; each board member takes the oath of public office].) However, the required exclusive control permits the Legislature or the electorate to fund entities that are provided a degree of flexibility and operational independence that encourages the development of innovative practices through experimentation with the objective of satisfying the underlying state purpose. (See *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1138-1141, 1146 [89 Cal.Rptr.2d 745].)[8] It appears that exclusive management and control by the state means the existence of sufficient controls over the commissions by the executive and legislative branches of the state government to assure that state funds are used to further state purposes without unduly inhibiting innovative programs that serve those purposes.

CART and CC contend that the executive branch controls over state agencies, including counties, normally exercised by the Governor do not exist over CCFC and the county commissions. They note the cornerstone of

---

[8] We further note that it should not matter whether the institution that is challenged as not under the exclusive management and control of the state is created by state legislation or initiative. To conclude otherwise the state by legislation could create an institution outside of its control and management and avoid the prohibition of article XVI, section 3. However, article XVI, section 3 does not prohibit the Legislature from converting a private institution into a state institution under the management and control of the state if its purposes are within the legislative power and involve some duty or function of government. (*Board of Directors v. Nye, supra,* 8 Cal.App. at p. 534.)

the Governor's control over the operation and management of state institutions is the agency structure in which agency secretaries are empowered to generally supervise the operations of an agency and are responsible for its fiscal management. (Gov. Code, §§ 12800, 12850, 12850.6.) The Governor exercises the ultimate control over state agencies and departments through the appointment and removal power of appointed public officials. (Gov. Code, § 12801.) They also point out that the budgetary process starts and ends with the Governor. (Art. IV, § 12.) The Department of Finance prepares the Governor's budget and each state agency must submit to it a proposed budget for the fiscal year. (Gov. Code, § 13320.) Until the enactment of the annual fiscal budget act, the Department of Finance may revise, alter or amend the budget of any state agency. (Gov. Code, § 13322.) After the Legislature has approved the final budget bill, the Governor has the power to veto, eliminate or reduce any item of appropriation for any agency program or service. (Art. IV, § 10, subds. (a), (e); see generally *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1320-1321, fn. 5 [26 Cal.Rptr.2d 666].) CART and CC contend that the CCFC is not a department, office or unit within a state agency and thus no agency secretary has the power to generally supervise its operations or the responsibility for its fiscal management. Rather, they contend, the CCFC is authorized to establish its own procedures for conducting its business. (§ 130130.) Moreover, they assert that the budget guidelines applicable to state agencies pursuant to Government Code section 13335 and former section 13336.5 are inapplicable to the CCFC. According to CART and CC, a consequence of the Act's mandatory appropriation is that the CCFC is not required to submit a complete and detailed budget to the Department of Finance, which has no authority to revise, alter or amend any CCFC budget. Further, the Governor has no power to veto, eliminate or reduce any item of CCFC appropriation after the Legislature's adoption of the state budget for that fiscal year. Finally, they contend the appointed members of the CCFC are not subject to removal by the persons making the initial appointment, or by the Governor or the Legislature. (§ 130115.)

Similarly, CART and CC argue the legislative controls over state agencies are nonexistent as to the CCFC. They emphasize the cornerstone of legislative control over state agencies is the "power of the purse" (see art. IV, § 12, subd. (e)). The Legislature exercises this control by appropriating funds and establishing spending priorities annually in the state budget. (See generally *Tirapelle v. Davis, supra,* 20 Cal.App.4th at p. 1320.) State agencies are required to appear before budget committees to explain and justify budget requests for each fiscal year and explain their expenditures and actions during the course of a prior fiscal year. (Gov. Code, § 13337, subd. (f).) The

Legislature further has the power of *oversight* of all state agencies (Gov. Code, § 9140 et seq.), utilizing the services of the Legislative Analyst (Gov. Code, § 9143) and the State Auditor (Gov. Code, § 8543) to review the functions and activities of a state agency and to intervene as necessary.[9] CART and CC argue that the mandatory appropriation to the Trust Fund under the Act deprives the Legislature of its "power of the purse" and oversight role. They emphasize that the reporting requirements of the CCFC involve substantially less documentation and data than is required for other departments. The CCFC has never appeared before a legislative budget committee and its budget is not included in the budget bill addressed by the Legislature. They argue the Act contains no process for formal oversight of the actions of the CCFC by the executive or legislative branches of the government.

CART and CC contend the management and control of the state over the county commissions is even more tenuous than over the CCFC. They assert that the county commissions are managed neither by the state through the counties, nor by the CCFC. CART suggests the county commissions' strategic plans and budgets are not subject to meaningful review by the CCFC. Rather, the CCFC's powers over the county commissions are limited to providing nonmandatory guidelines and technical assistance and reviewing their annual audits and reports. CART further asserts that the county boards of supervisors have no authority to disapprove, revise or alter the budgets of any of the county commissions. Additionally, counties have no audit or oversight responsibility regarding the county commissions. Instead, each county commission reimburses the county 100 percent of any costs, including personnel, because the county commission pays for its own equipment, property and supplies. Simply stated, county commissions are self-sufficient. Finally, CART argues that neither the CCFC nor the county boards of supervisors have any authority to approve or reject the strategic plan or budget for a county commission. CART notes that after county commissions have adopted strategic plans, they need not seek or obtain approval from the CCFC to obtain or expend revenues received from the Trust Fund.

A detailed review of the Act and the external controls it imposes on the CCFC and county commissions persuades us that the commission structure under the Act designed to administer its tobacco tax revenue does not violate the prohibition of article XVI, section 3 against state funding of entities not under the state's exclusive management and control. The challenged aspects of the Act providing flexibility through local control and

---

[9]However, the Bureau of State Audits is "independent of the executive branch and legislative control." (Gov. Code, § 8543.)

continuous appropriation, which bypass the legislative budgetary process, are methods that have been sanctioned in the past. The Act is replete with controls, including the manner of appointment of members of both the CCFC and county commissions, the specificity regarding how tax revenues must be spent, and the annual audit and reporting requirements. Moreover, the CCFC and county commissions are subject to stringent external statutory controls imposed by the State Controller, the Department of Finance, and the Bureau of State Audits, and by a myriad of statutory requirements. Additionally, the implementation of the Act shows that the CCFC and county commissions are public entities under state control. Finally, the Act and the official voter pamphlet show the electorate intended to create the CCFC and county commissions as state agencies.

Preliminarily, we address funding the CCFC and county commissions by a continuous stream of appropriations and affording them broad discretion to accomplish the goals specified by the electorate or the Legislature. Continuous appropriation of state funds is not unusual. It reflects the Legislature's, or in this case the electorate's, policy decision to exercise its discretionary controls governing appropriating funds and setting spending priorities by designating continuous funding for a specific purpose. �In Authority to bypass the legislative budget process and to provide by statute continuous appropriation of state funds is "recognized in article IV, section 12[,] . . . authoriz[ing] the Legislature and hence the people to provide by statute for a continuing appropriation to pay for some specified program. [Citation.]" (*People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 329, fn. 13 [226 Cal.Rptr. 640].) Robert Olson of the Department of Finance testified that between 200 and 400 continuous appropriations exist under state law. For example, the State Lottery Fund (Gov. Code, § 8880.61, subd. (a)), the Fair Political Practices Commission (Gov. Code, § 83122), the Export Finance Fund (Gov. Code, § 15395.2) and the Bureau of State Audits (Gov. Code, § 8544.5, subd. (a)) all receive continuous funding by statute. The State Lottery Fund and the Fair Political Practices Commission are both creations of the initiative process. CART accurately responds that the issue is not whether continuous appropriations may be valid, but whether sufficient controls are retained by the state over expenditures from these appropriations.[10] ▮ Rather, the issues are whether, with the continuous appropriation of state funds, the Act in specifying the allocation of the Act's

---

[10]CART points out that significant controls exist as to the cited continuous appropriations. For the State Lottery Fund, the Governor may remove commissioners and the director, its accounts must be audited annually by an independent firm of certified public accountants, and the Controller must audit its accounts quarterly. (Gov. Code, §§ 8880.16, subd. (f), 8880.23, 8880.43, 8880.67.) Expenditures from the Fair Political Practices Commission's continuous funding are "subject to the normal administrative review given to other state appropriations."

tax revenue funds, the manner in which they must be spent and the auditing oversight, combined with other external controls, provide adequate state controls to permit categorizing the CCFC and county commissions to be within the exclusive management and control of the state. Similar considerations apply to the conferral of broad discretion to local agencies to accomplish the goals specified by the Legislature or the electorate. Examples include independent county health authorities (Welf. & Inst. Code, § 14087.38),[11] charter schools (*Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at pp. 1129, 1146) and federal community block grant programs (see Gov. Code, § 12726 et seq.).[12]

Reiner and the Attorney General suggest the most obvious indicator of state control over the commissions is that they were established by statute passed by the electorate, which by repeal can eliminate them whenever it chooses. They note that in March 2000 the electorate defeated Proposition 28, a statewide ballot initiative, with 72.2 percent voting against repealing the Act's tax and abolishing the Trust Fund. They assert that there can be no greater control than the power to abolish an institution, something neither the Legislature nor the electorate can do to a private entity without violating due process. Moreover, they note that either the people by initiative or the Legislature by a two-thirds vote can amend the Act to establish different controls or tighten existing controls. Although the Legislature has already amended the Act three times, it has not established tighter state fiscal controls. Rather, both the electorate and the Legislature have treated the Act's commissions as governmental entities subject to the full panoply of statutes governing the use of public funds, conflicts of interest, public meetings and civil service. Where, as here, the electorate or the Legislature delegates broad discretion to local agencies to accomplish goals specified in legislative enactments, it retains the ultimate control to refine, expand, reduce or abolish the statutory creatures. (See *Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 1135.) ■■■ However, we agree with

(Gov. Code, § 83122.) The Export Finance Board is structurally within the Technology, Trade, and Commerce Agency, which is administered by an agency secretary who reports to the Governor. (Gov. Code, §§ 15311, 15392, 15394, subd. (a).) Finally, the Bureau of State Audits reports to the Little Hoover Commission, which reports to the executive branch regarding appropriations of funds approved by the Legislature. (Gov. Code, §§ 8502, 8543.)

[11]Marianne Maxwell, a drafting consultant for the Act, testified that she based the Act's county commission structure on the structure used by counties in establishing independent county health authorities.

[12]Rob Reiner testified that the concept underlying the county commission structure is similar to the concept behind the federal community block grant programs. However, CART points out there is no evidence the county health authorities receive funding from the state over which the Governor and the Legislature have no oversight. Block grants are distributed by a department within the Health and Welfare Agency, which is supervised by a Secretary who reports to the Governor, and the Legislature conducts hearings on the use of grant funds. (Gov. Code, §§ 12800, 12801, 12730, subd. (c), 12741, subd. (b), 12085, subd. (b), 12085.5.)

CART and CC that the power to repeal or modify does not demonstrate that the commissions are under the exclusive management and control of the state. We know of no authority establishing that the electorate or the Legislature is entitled to create commissions operating outside of state management and control solely because the power to abolish them is retained. Were that the case, then article XVI, section 3 would be meaningless when applied to any institution created by the state, regardless of how that institution is controlled, because it is always the case that what the state creates it can repeal. If a statute violates the Constitution, the fact it may be amended or repealed does not make it constitutional. The "control by repeal" test to determine whether the state has retained exclusive management and control over the commissions is not helpful.

 Nevertheless, the Act is replete with state controls on the commissions. Unlike a private entity, only elected officials can appoint the members of the commissions and membership of the commissions must include public officials. Consequently, the commissioners are either directly or indirectly accountable to the people. (*Howard Jarvis Taxpayers' Assn. v. Fresno Metropolitan Projects Authority, supra,* 40 Cal.App.4th at p. 1388.) Of the seven members of the CCFC, the Governor appoints three (including the chairperson), the Speaker of the Assembly appoints two and the Senate Rules Committee appoints the remaining two. CCFC commissioners are limited to two 4-year terms. One of the Governor's appointees to the CCFC must be either a county health officer or a county executive, and the Secretary of the Health and Human Services Agency and the Secretary for Education, or their designees, serve as ex officio nonvoting members.[13] (§§ 130110, 130115.) By comparison, the members of the California Medical Assistance Commission are appointed in the same manner as the members of the CCFC, and also serve fixed terms. (Welf. & Inst. Code, § 14165.2.)[14] Under the Act, the county board of supervisors determines the "manner of appointment, selection, or removal of members of the county commission, the duration and

---

[13]Presumably, the Cabinet Secretaries or their designees sit on the CCFC to provide relevant insight and expertise, and to influence policy to obtain consistency in direction with the executive branch. Reiner testified that the CCFC sought "their advice and counsel as to how [CCFC decisions relate] to considerations [of] the governor."

[14]CC and CART challenge the adequacy of these appointment provisions and suggest accountability is absent because the appointing officers have no power of removal and the CCFC members serve fixed terms and do not serve at the pleasure of the appointing authority. This feature is not unique. Commissioners of other state agencies do not serve at the pleasure of their appointing authority. (See, e.g., California Medical Assistance Commission (Welf. & Inst. Code, § 14165.2), State Commission on Teacher Credentialing (Ed. Code, § 44213), Student Aid Commission (Ed. Code, § 69511), and Fair Employment and Housing Commission (Gov. Code, § 12903).) Moreover, the Attorney General can initiate an action to remove a CCFC member for failing to discharge his or her duties, incapacity, or conviction of a felony. (Code Civ. Proc., § 803; Gov. Code, §§ 1770, 3000.)

number of terms county commission members shall serve, and any other matters that the board of supervisors deems necessary or convenient for the conduct of the county commission's activities," except that compensation for commission members is limited to a reasonable per diem and reimbursement for reasonable expenses of attending meetings. (§ 130140, subd. (a)(1)(B).) County commissions must include a member of the board of supervisors and two county officers who work in health or human services. (§ 130140, subd. (a)(1)(A)(i), (ii).) The county board of supervisors appoints all the members of the county commission. (§ 130140, subd. (a)(1)(A).) Local governance and this appointment process were also modeled after statutorily established programs.

The Act mandates how the tobacco tax revenue must be spent. Twenty percent of the revenue is distributed to the CCFC, which must use it as follows: 6 percent for mass media communications regarding early child development, the prevention of tobacco use by pregnant women and the detrimental effects of secondhand smoke on early child development; 5 percent for parental education training and technical assistance for the county commissions; 3 percent for child care programs; 3 percent for research and development of standards for early child development programs; 1 percent for administration; and the remaining 2 percent for any of the authorized uses with the exception of administration. (§ 130105, subd. (d)(1).) Eighty percent of the revenue is allocated and appropriated to the county commissions in proportion to the number of births in the county to the number of births in the state. (§§ 130105, subd. (d)(2), 130140, subd. (a).) This revenue must be expended only for the purposes authorized by the Act and in accordance with the specific county strategic plan approved by the county commission. (§ 130105, subd. (d)(2)(A).) To be eligible for funds, a county commission must adopt a strategic plan consistent with and in furtherance of the purposes of the Act and the CCFC guidelines, and conduct an independent annual audit. (§ 130140, subds. (a)(1)(C)(i), (b) & (d)(2).) The CCFC guidelines must at minimum address: (1) parental education and support services related to informed and healthy parenting, including prenatal and postnatal infant and maternal nutrition, newborn and infant care, child abuse prevention, avoidance of tobacco, drugs and alcohol during pregnancy, and support services for the development and maintenance of self-sufficiency, domestic violence prevention and treatment, tobacco and other substance abuse control and treatment, and voluntary intervention for families at risk; (2) the availability and provision of high quality, accessible and affordable child care; and (3) the provision of child health care services that emphasize prevention and treatment not covered by other programs and prenatal and postnatal maternal health services that emphasize prevention

and treatment, including treatment of tobacco and other substance abuse, not covered by other programs. (§ 130125, subd. (b)(1).) Accordingly, although county commissions are conferred significant independence and discretion in adopting their strategic plans and programs to promote local decision-making, the commissions cannot expend tobacco tax revenue on programs inconsistent with the CCFC's guidelines and the purposes of the Act. This limitation on spending provides the necessary specificity to implement the electorate's policy decision to delegate to the county commissions the responsibility of tailoring their programs to address the needs of their respective counties.

The Act further requires the CCFC and county commissions to annually conduct audits and issue written reports "on the implementation and performance [of] their respective functions during the preceding fiscal year, including, at minimum, the manner in which funds were expended, the progress toward, and the achievement of, program goals and objectives, and the measurement of specific outcomes through appropriate reliable indicators." (§ 130150.) Each county commission is required to transmit its annual audit and report to the CCFC (*id.,* subd. (a)), which must consolidate, analyze and comment on all the audits and reports from the county commissions, together with the audit and report of CCFC's activities, in a consolidated written report transmitted to the Governor, the Legislature, and each county commission (*id.,* subd. (b)). The county commissions are required to make available to the general public copies of these reports at no cost (*id.,* subds. (c) & (d)), and to hold at least one public hearing before adopting an annual audit and one public hearing after receiving the CCFC's written compilation of annual audits (§ 130140, subd. (a)(1)(G) & (H)). CART suggests that the CCFC conducts its own audits and that the county commission audits are not independent financial audits conducted by an outside entity. However, the trial court correctly interpreted the requirement of annual audits as necessarily implying they are independently conducted. The purpose and scope of the audits and their required transmission to the Governor and the Legislature permit no other interpretation to be reasonably inferred. Contemporaneous administrative interpretation of law is a proper tool for interpretation. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 6-7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) The record here is replete with testimony that the Department of Finance conducts the annual audit of the CCFC and that, consistent with CCFC directions, the county commissions' annual audits are independently conducted.[15] Moreover, this interpretation is compelled by the declarations of the Act that its

---

[15]It does not matter whether these independent audits resulted from contemporaneous interpretation of the statutory scheme by the CCFC or the Department of Finance.

objective is to facilitate "the creation of a seamless system of integrated and comprehensive programs and services, and a funding base for the system with program and financial accountability . . . ." (Prop. 10, § 2, subd. (m).) ■■■ ■ ■ As Janet Rosman of the Department of Finance testified, an audit must be independently conducted.[16]

■ The CCFC and county commissions are also subject to stringent statutory controls beyond those established by the Act, including intervention by the State Controller, the State Auditor, the Department of Finance and the State Treasurer to monitor the manner in which the Act's tax revenues are spent by the CCFC and county commissions. For example, Government Code section 12410 authorizes the State Controller to audit any disbursement of state funds for correctness, legality and the availability of funds to support the payment. It requires the Controller to ensure adequate funds are available in the appropriate commission account to pay expenses. The Controller's duty to audit "includes the duty to ensure that expenditures are authorized by law . . . ." (*Tirapelle v. Davis, supra,* 20 Cal.App.4th at p. 1335.) The Department of Finance is authorized by Government Code section 13070[17] to investigate all financial and business matters of the state and investigate state agencies that receive state funds. Under Government Code section 13030, it is a misdemeanor to fail or neglect to file with the Department of Finance any report required by the Government Code, to fail or neglect to follow its directions in keeping the accounts of an agency, or to refuse to permit or interfere with the examination of or access to an agency's records and books. Finally, under Government Code section 8545.2, subdivision (a), the State Auditor is authorized "to examine and [reproduce] any and all books, accounts, reports . . . and other records, bank accounts, and money or other property, of any agency of the state, whether created by the California Constitution or otherwise, and any public entity, including any city, county, and school or special district for any audit or investigative audit." The State Auditor may also conduct financial and performance audits of any state agency, which includes every "state office, officer, department,

---

[16]The trial court correctly recognized that even if the language of the Act were ambiguous in regard to the type of audit that must be conducted, the Act could not be interpreted in any other way. When confronted with a statute reasonably susceptible of two or more interpretations, of which at least one raises constitutional questions, the court should construe it in a manner that avoids any doubt regarding its validity. (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150].)

[17]Government Code section 13070 provides: "The department has general powers of supervision over all matters concerning the financial and business policies of the State and whenever it deems it necessary, or at the instance of the Governor, shall institute or cause the institution of such investigations and proceedings as it deems proper to conserve the rights and interests of the State."

division, bureau, board, and commission" (Gov. Code, § 11000), and any local governmental agency, including any city, county, and school or special district. (Gov. Code, § 8546.1.) At the request of the Joint Legislative Audit Committee, the State Auditor shall audit a state or local governmental agency or any other publicly created entity. The State Auditor is authorized to audit any contract involving more than $10,000 of public funds at the request of any state or local public entity that is a party to the contract or is undergoing an audit by the State Auditor. (Gov. Code, § 8546.7.) Further, under the state whistleblower statute, the State Auditor is authorized to conduct an investigative audit on receiving specific information that any employee or state agency is engaged in any improper governmental activity. (Gov. Code, § 8547.5.) If the State Auditor discovers evidence of wrongdoing, the employing agency and, if appropriate, the Attorney General, the appropriate legislative policy committees and any other authority that the State Auditor determines appropriate shall be informed. (Gov. Code, § 8547.7.)[18]

We note the record contains testimony that the commissions govern themselves in the same fashion employed by other governmental entities. A representative of the State Controller's Office described the procedures the CCFC must follow to obtain a warrant for any of the Act's tobacco tax revenue. A representative of the Department of Finance testified regarding the process followed in auditing the CCFC's use of its funds and the results, including the department's counseling regarding audit findings and applicable state standards and procedures that should be followed. Several witnesses testified regarding the relationship between the Department of General Services and the CCFC, the state contracting procedures the former requires the latter to follow, and under what circumstances the CCFC would be excused from using the competitive bidding process. Moreover, CCFC members have taken oaths of office and adopted a conflict of interest code. The CCFC complies with the Bagley-Keene open meetings law as well as the Public Records Act. Its contracts have been approved by the Department of General Services. Testimony further established that CCFC employees are subject to civil service requirements and that the Department of Personnel Administration approves salaries, positions and duty statements for CCFC employees.

Testimony showed that the county commissions govern themselves in a manner similar to the CCFC. The San Diego County Commission holds two

---

[18]County commissions are also subject to prudent investor rules (Gov. Code, § 53600), financial transaction reporting rules (Gov. Code, §§ 53890-53891), the Meyers-Milias-Brown Act (Gov. Code, § 3501), the Political Reform Act (Gov. Code, § 82003), the Brown Act (Gov. Code, § 54951), the Public Records Act (Gov. Code, § 6252), the California Tort Claims Act (Gov. Code, § 811.2), the Public Contract Code (Pub. Contract Code, § 1100), and county grand jury investigations (Pen. Code, § 925).

meetings per month that are open to the public under the Brown Act, and its funds are held in the county trust fund and invested according to county investment guidelines. In addition, its employees are employees of the County of San Diego, and their positions have been added to the county salary ordinance. The executive director of the Ventura County Commission testified that although she is not an employee of that county, the county auditor/controller was conducting a financial and performance audit of the commission to satisfy the annual audit requirement under the Act. The Ventura County Commission has adopted a conflict of interest code. Although the Los Angeles County Commission was created under section 130140.1, subdivision (a) as a public entity separate from the county, the Los Angeles County Treasurer's Office controls the bulk of the commission's funds and has exercised its control over the commission's access to the revolving fund by refusing access until bookkeeping discrepancies have been resolved. That office keeps the bulk of the commission's funds on its books and in its investment pool.

The people through the initiative process adopted the Act, which established the CCFC and county commission structure, and provided commission funding by continuous appropriation. The Act directs the commissions to achieve broadly stated goals and provides the county commissions with local autonomy to meet local needs. The Act does not alter the external fiscal control of the commissions by state agencies responsible for overseeing governmental entities. The commissions' membership consists of elected government officials or appointees of elected government officials, which guarantees public accountability while providing both executive and legislative controls. The Act defines with reasonable specificity the use of the tobacco tax revenue, provides annual independent audit and reporting requirements, and subjects the commissions to many statutory requirements and features of other state agencies. Finally, our conclusion that the commissions are state agencies under the Act is consistent with the evident intent of the electorate.[19] The official voter pamphlet in its official title and summary for the Act and the analysis by the Legislative Analyst advised the voters that the Act created a new *state* commission.[20] We are persuaded the

---

[19]Our conclusion that the commissions are public entities under the exclusive control and management of the state resolves CART's further claim that the Act violates article II, section 12, prohibiting any initiative that "names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty . . . ." The commissions are not private corporations. (Cf. *Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d 805, 832-835.)

[20]The initiative's opponents urged voters to reject the Act because it created "a massive new state bureaucracy."

Act's commission structure does not violate the exclusive management and control provision of article XVI, section 3.[21]

V

DELEGATION OF MUNICIPAL AUTHORITY TO PRIVATE ENTITIES

CC asserts the Act violates article XI, section 11, subdivision (a) by delegating municipal authority to private entities. That provision states: "The Legislature may not delegate to a private person or body power to make, control, appropriate, supervise, or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or assessments, or perform municipal functions." CC contends that the CCFC and the county commissions are private bodies to which the Act provides funding for traditional municipal functions. However, we have concluded the commissions are public entities subject to many controls. Moreover, this prohibition does not apply where "it is the local governing body, and not the legislature [or the people by initiative], that confers [on] the [new entity] the right to exercise its functions." (*The Housing Authority v. Dockweiler* (1939) 14 Cal.2d 437, 463 [94 P.2d 794].) Under the Act the county board of supervisors, the local governing body, does not confer on the county commission the right to exercise its power. Rather, by sections 130140 and 130140.1, the Act sets forth the powers and duties of county commissions and authorizes

---

[21]We grant CART's request to take judicial notice of CCFC Project Proposal (agenda item No. 9) for the June 20, 2002 meeting; minutes for the June 20, 2002 meeting of the CCFC; and the 2001-2002 Kern County Grand Jury, Ad Hoc Committee Report on the Kern County Children and Families Commission. (Evid. Code, §§ 452, 459; see *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 374-375, fn. 4 [87 Cal.Rptr.2d 654, 981 P.2d 499]; *Butt v. State of California* (1992) 4 Cal.4th 668, 676-677, fn. 6 [15 Cal.Rptr.2d 480, 842 P.2d 1240]; *Citizens for Jobs & the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311, 1323-1324 [115 Cal.Rptr.2d 90].) We deny the Attorney General's motion to strike CART's reply brief to the extent it relies on the judicially noticed material.

We note that in doing so the proffered documents shed light on the working relationship between the executive branch and the CCFC, as well as show a specific control placed on county commissions. The judicially noticed CCFC records show that the Governor and the CCFC worked together to fund a public awareness campaign for the Safe Arms for Newborns Legislation that was signed by the Governor and went into effect in January 2001. After the Governor for budget reasons vetoed follow-up legislation that would have provided $1 million for a public awareness campaign, the Governor later committed $500,000 to the campaign and instructed the Department of Social Services to pursue collaborative efforts to explore a cost-effective manner of addressing the issue while the legislation-sponsoring Senator successfully obtained additional funding through the CCFC. The Kern County Grand Jury Committee Report on the Kern County Commission illustrates how county commissions are subject to the control of grand jury investigation and may benefit from the recommendations of independent grand jury analysis.

the counties to establish them by ordinance if they so choose. The Act does not unconstitutionally delegate municipal authority to private entities.[22]

## VI

### The Doctrine of Separation of Powers

 CC contends the Act violates the separation of powers doctrine contained in article III, section 3 by commingling legislative and executive powers in the CCFC and county commissions. CC asserts that the initiative authorizes the appropriation of funds (a legislative power) by the CCFC and the county commissions, essentially executive agencies, and improperly allows legislative appointment of a majority of the CCFC commissioners (an executive power). Thus, as to the CCFC, CC contends that the Act gives the executive agency the power to appropriate, which belongs to the Legislature, and provides the Legislature too much power in the appointment process of CCFC commissioners, which belongs to the executive. We conclude the Act does not violate the separation of powers doctrine.

 Article III, section 3 provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." The separation of powers doctrine is designed to prevent the combination of the basic or fundamental powers of government in the hands of a single person or group. (*Manduley v. Superior Court, supra,* 27 Cal.4th at p. 557.) However, it " ' "does not command 'a hermetic sealing off of the three branches of Government from one another.' " ' " (*Obrien v. Jones* (2000) 23 Cal.4th 40, 48 [96 Cal.Rptr.2d 205, 999 P.2d 95], quoting *In re Attorney Discipline System* (1998) 19 Cal.4th 582, 602 [79 Cal.Rptr.2d 836, 967 P.2d 49].) " 'The doctrine has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another.' [Citation.] The separation of powers doctrine 'recognizes that the three branches of government are interdependent, and it permits actions of one branch that may "significantly affect those of another branch." [Citation.]'

---

[22]CC relies on *Howard Jarvis Taxpayers' Assn. v. Fresno Metropolitan Projects Authority, supra,* 40 Cal.App.4th 1359. However, article XI, section 11 applied there because the Legislature, not Fresno County, established the Fresno Metropolitan Projects Authority (FMPA). (*Howard Jarvis,* at p. 1364.) Moreover, unlike the commissions here, the FMPA was a private body composed of members appointed by private entities not accountable to the electorate.

[Citation.] The doctrine ' "is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." [Citation.]' [Citation.]" (*Manduley v. Superior Court, supra,* 27 Cal.4th at p. 557.)

▮ The separation of powers doctrine is expressed in a system of checks and balances designed to prevent any governmental branch from obtaining arbitrary or inordinate power. (*Manduley v. Superior Court, supra,* 27 Cal.4th at p. 592 (dis. opn. of Kennard, J.).) It does not imply that the three branches are not in many respects mutually dependent, but instead that substantial interrelatedness of the three branches is apparent and commonplace—an "interrelationship [that] lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52-53 [51 Cal.Rptr.2d 837, 913 P.2d 1046].) A panel of this court recognized more than a decade ago that "[t]ime has blurred the purity of division of governmental functions, . . . particularly with the advent of administrative agencies." (*Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 565 [275 Cal.Rptr. 250].) This phenomenon led Administrative Law Professor Kenneth Culp Davis to pragmatically characterize the separation of powers doctrine as applied to administrative agencies as a " 'principle of check': 'In the organic arrangements that we have been making in recent decades in the establishment and control of administrative agencies, the principle that has guided us is the principle of check, not the principle of separation of powers. We have had little or no concern for avoiding a mixture of three or more kinds of power in the same agency; we have had much more concern for *avoiding or minimizing unchecked power.* . . .' " (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 361-362 [261 Cal.Rptr. 318, 777 P.2d 91] [quoting 1 Davis, Administrative Law Treatise (1958) § 1.09, pp. 68-69].)

▮ CC argues that the commissions exercise both legislative and executive authority. With regard to the former, it cites the powers to appropriate funds and to establish budgets and spending priorities. As to the latter, it cites the powers to establish programs, expend funds, enter into contracts, adopt regulations and administer programs. CC primarily focuses on the legislative power to appropriate, which it contends the Act delegates to the commissions, while in comparison Proposition 99 reserves to the Legislature the power to appropriate the tobacco tax collected under that measure. (See art. IV, § 12, subd. (e); Rev. & Tax. Code, §§ 30122, 30123, 30124; see also *American Lung Assn. v. Wilson* (1996) 51 Cal.App.4th 743, 746 [59 Cal.Rptr.2d 428].) Consequently, CC contends that under the Act

the CCFC appropriates within each of the six subaccounts under section 130105 by selecting and funding the programs to be pursued within the specific subaccounts. According to CC, the county commissions have "complete discretion" to appropriate the funds they receive from the trust fund because the Act provides no required allocation of those funds or any direction or limitation regarding their expenditure except that they be expended only for purposes authorized by the Act and in accordance with the local county strategic plan. (§ 130105, subd. (d)(2)(A).)[23]

Our difficulty with CC's argument is that the commissions do not appropriate in the first instance the Act's tobacco tax revenue.[24] Rather, the people performed that function when they adopted the Act, which designates how the revenue is to be spent. The legislative power is vested in the Legislature except to the extent the people execute that power pursuant to their reserved initiative and referendum powers. (Art. IV, § 1.) Pursuant to Revenue and Taxation Code section 30131.2, subdivisions (a) and (b), the people imposed an additional tax on every distributor of cigarettes and an additional tax on every distributor of other tobacco products. Revenue and Taxation Code section 30131.3 was enacted by the Act, providing that "all moneys raised pursuant to the taxes imposed by Section 30131.2 shall be deposited in the California Children and Families Trust Fund and are continuously appropriated for the exclusive purpose of the California Children and Families Program established by Division 108 (commencing with Section 130100) of the Health and Safety Code." By that provision, the people appropriated the Act's tax revenue, directing its continuous appropriation or deposit in the Trust Fund. By enacting section 130105, subdivision (d), the people further "allocated and appropriated" those funds to the CCFC and its six separate

---

[23]CC asserts the most striking example of the commissions' legislative power of appropriation is not their power to appropriate funds for specific programs or services, but rather their power to choose not to do so. (§ 130105, subd. (d)(1)(H) & (2)(B).) These provisions require that any funds allocated and appropriated to the commissions that are not encumbered or expended within any applicable period prescribed by law shall, with the accrued interest, revert to and remain in the same account or local Trust Fund for the next fiscal year. They essentially mirror Revenue and Taxation Code section 30124, subdivision (c), stating that Proposition 99 revenue appropriated by the Legislature from any specific account not encumbered within the period prescribed by law shall revert to the account from which they were appropriated. To provide otherwise would be inconsistent with the specific continuous appropriation and, more importantly, the determination by the electorate of funding priorities and the manner in which the tax revenue is allocated.

[24]We evaluate here the legislative power to appropriate, accompanied by the powers to establish budgets and spending priorities, at the primary decisionmaking level by the Legislature or the people by initiative or referendum. Inevitably, whenever an appropriation is made for a specific program, the agency responsible for administering that program further *appropriates* that funding at a secondary level to carry out the program, exercising its administrative discretion consistent with the legislative directive.

subaccounts and the county commissions. As to the CCFC, the people exercised the legislative power to appropriate funds with specific guidance of fund allocation. As to the county commissions, the people restricted their allocation of funds to promote local decisionmaking, enabling the commissions to tailor their programs to the specific needs of their counties. Nevertheless, as we have already explained, reasonable specificity and direction is obtained by the Act requiring the local plan to be consistent with the goals of the initiative and the CCFC guidelines. CC has not proffered authority invalidating lump sum appropriations or continuous appropriations. Insofar as CC challenges the Act for illegally delegating legislative policymaking power to the commissions by leaving to them the fundamental policy matters or by not providing adequate direction for the implementation of that policy (see *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 491-492 [97 Cal.Rptr.2d 334, 2 P.3d 581]), the Act and the statutory scheme it implements do provide the necessary guidance for the expenditure of the challenged appropriations to withstand this allegation of unconstitutional delegation of legislative authority.

CC asserts the illegal combination of legislative and executive power in the CCFC is reflected by its membership consisting of four legislative appointees, three gubernatorial appointees, and two ex officio nonvoting members (the Secretary of the Health and Human Services Agency and the Secretary for Education, or their designees). (§ 130110.) ▮ It argues that neither the people nor the Legislature can create an agency in the executive branch of government and then maintain control over that agency to the exclusion of the Governor without offending article III, section 3.[25] However, appointment mechanisms specified by the Legislature, or the electorate by initiative here, are permissible provided they are subject to sufficient executive controls to ensure in context that the appointments do not impair the executive branch's authority over the commissions. (See *Obrien v. Jones, supra,* 23 Cal.4th at pp. 43-44 [upholding a statutory appointment mechanism authorizing the Legislature to appoint two and the Governor to appoint one of the five members of the State Bar Court, concluding it was subject to sufficient judicially controlled protective measures so as to ensure that such appointments do not impair the Supreme Court's primary and ultimate authority over the attorney admission and discipline process, thus not violating the separation of powers provision].) ▮ The Act contains many executive controls, including the Governor's

[25]We note that "the power of appointment to office, so far as it is not regulated by express provisions of the constitution, may be regulated by law, and if the law so prescribes, may be exercised by the members of the legislature." (*People v. Freeman* (1889) 80 Cal. 233, 236 [22 P. 173]; see 13 Cal.Jur.3d (1989) Constitutional Law, § 110, p. 253.)

appointment of three of the seven voting members on the CCFC to fixed terms (including the chairperson); the cited cabinet secretaries or their designees serve as ex officio nonvoting members on the CCFC, presumably to provide counsel on policy; the Attorney General can initiate an action to remove a CCFC member for failing to discharge his or her duties, incapacity or conviction of a felony; the CCFC and the county commissions are required to annually conduct independent audits and issue written reports and the CCFC is further required to consolidate, analyze and comment on the audits and reports and forward a written report to the Governor, the Legislature and each county commission; and finally, the commissions are subject to a wide variety of stringent statutory controls authorizing intervention by the State Controller, the independent State Auditor, the Department of Finance and the State Treasurer to monitor the manner in which the Act's tax revenues are spent by the CCFC. These controls persuade us that within the context of the "principle of check," the Act and the commission structure do not create unchecked power. Accordingly, the appointment mechanism here does not violate the doctrine of separation of powers.

## VII

### REVISION OF THE CONSTITUTION

CC contends that the Act is a constitutional revision, in contrast to a constitutional amendment, because it removes the Legislature and Governor from their constitutional roles in the expenditure of a significant amount of taxpayer dollars and places that power in unelected commissioners. The Act, CC argues, is therefore in direct conflict with our representative system of government in violation of article XVIII, sections 1 and 2.

Although the electorate may amend the Constitution by initiative (art. XVIII, § 3), a revision of the Constitution may be accomplished only by a constitutional convention and popular ratification (art. XVIII, § 2) or by legislative submission of the measure to the electorate (art. XVIII, § 1). (*Raven v. Deukmejian, supra,* 52 Cal.3d at p. 349; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 221 [149 Cal.Rptr. 239, 583 P.2d 1281].) It has been suggested "the revision provision is based on the principle that 'comprehensive changes' to the Constitution require more formality, discussion and deliberation than is available through the initiative process. [Citation.]" (*Raven v. Deukmejian, supra,* 52 Cal.3d at pp. 349-350; cf. *Legislature v. Eu, supra,* 54 Cal.3d at p. 506.) The revision/ amendment analysis requires the court "to examine both the quantitative and qualitative effects of the measure on our constitutional scheme[, as] [s]ubstantial changes in either respect could amount to a revision. [Citations.]"

(*Raven v. Deukmejian, supra,* 52 Cal.3d at p. 350; *Legislature v. Eu, supra,* 54 Cal.3d at p. 506.) Whether an initiative constitutes an amendment or revision to the Constitution does not necessarily depend on the number of constitutional provisions it affects, but on the nature of the changes it makes. (Grodin et al., The California State Constitution: A Reference Guide, *supra,* at pp. 303-304.) For a revision to be found, "it must *necessarily or inevitably appear from the face* of the challenged provision that the measure will substantially alter the basic governmental framework set forth in our Constitution. [Citations.]" (*Legislature v. Eu, supra,* 54 Cal.3d at p. 510, original italics.)

It does not necessarily or inevitably appear from the face of the Act that its provisions will substantially alter the basic governmental framework set forth in our Constitution by diminishing legislative and executive power over the expenditure of tax revenue and transferring that power to unelected commissioners in direct conflict with our representative system of government. CC's suggestion that the Act constitutes a broad attack on the Legislature's power to exercise independent judgment over budget priorities provided in the Constitution ignores the facts that: article IV, section 12, subdivision (e)[26] is permissive, not mandatory, in character; over 200 continuous appropriations under state law require no legislative action; and two other commissions created by the initiative process receive some funding based on a continuous revenue stream not subject to legislative oversight. (At pp. 820-821, *ante.*) Moreover, we have concluded that (1) the voters acting in their legislative capacity appropriated the Act's tobacco tax revenue and determined the purposes for which it shall be used, and (2) the commissions are accountable public entities subject to the exclusive management and control of the state.

CC relies on *McFadden v. Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787] to support its position. In *McFadden,* the Supreme Court was confronted by an initiative proposing to add 21,000 words to our then existing 55,000-word Constitution, affecting 15 of its 25 articles. The measure dealt with such disparate subjects as retirement pensions, gambling, taxes, healing arts, civic centers, surface mining, fishing, city budgets, liquor control, senate reapportionment, and oleomargarine. (*Id.* at pp. 334-345.) The Supreme Court concluded that the measure constituted an improper revision of the State Constitution, characterizing it as "far reaching and multifarious," denying the electorate an opportunity to express approval or disapproval severally as

---

[26]Article IV, section 12, subdivision (e) provides: "The Legislature may control the submission, approval, and enforcement of budgets and the filing of claims for all State agencies."

to each major change suggested. (*Id.* at pp. 332, 346.) CC relies on the provision that would have established a state pension commission armed with comprehensive governmental powers to be exercised by five commissioners. The Supreme Court commented: "The delegation of far reaching and mixed powers to the commission, largely, if not almost entirely in effect, unchecked, places such commission substantially beyond the system of checks and balances which heretofore has characterized our governmental plan. It will be remembered that the measure prescribes no qualifications for holding the office of commissioner, other than that the person 'shall have been an elector of this state for two years next preceding his election'; he is, as of absolute right, eligible for re-election; the commission, itself, may fill vacancies for unexpired terms; it has unlimited powers to propose and submit 'amendments' to the 'article'; every sentence and clause of our Constitution in conflict with the article is to 'the extent of such conflict' repealed; the commission is given practically uncontrolled power over the funds collected, including, apparently, the substantially absolute power to give 'reimbursement or compensation for expenses incurred by' a 'volunteer worker in a political campaign'; the commission is given power to issue subpoenas and, apparently, to punish for contempt and subject persons 'to the same penalties as if such disobedience or false swearing occurred in an action in the superior court.' The governor, the Legislature, and the courts are made powerless to remove a commissioner for any cause, or directly 'to interfere with the effectiveness or operation of this article,' apparently as construed by the commissioners; or, without approval by a vote at a general election 'subsequent to 130 days after such decision or order shall become final,' to enforce 'any decision or order' of a court 'in any action or proceeding in law or equity' 'which adversely, or at all, either affects this article or the administration thereof or affects the submission, by the pension commission, of any proposed amendment to this article.' Thus, in litigation anywhere within the vast sweep of the measure (from gamblers to ministers; from mines to civic centers; from fish to oleomargarine; from state courts to city budgets; from liquor control to senate reapportionment; from naturopaths to allopaths; from proposing constitutional amendments to reimbursing political campaign workers; and from taxes to pensions), our heretofore zealously guarded principle of justice equally available through the courts for poor and for rich, for weak and for strong, and for all of every station alike, would be fettered, if not discarded, and justice, in its final attainment, would depend not alone on the justice of the cause, not as of right on the verdict of a jury or on truth or law or equity, but on the political sagacity and acumen, and the financial ability, of the litigant to wage a successful political campaign in defense of the judgment to which the court had found him entitled." (*Id.* at pp. 348-349.)

We include this lengthy quotation to consider in context CC's suggestion that the Act's commissions are vested with even more power than the pension commission rejected in *McFadden*. The Act's commission structure provides reasonable autonomy and promotes local decisionmaking and control over program and service priorities consistent with the purposes of the Act. However, as we have held, the commission structure operates under the exclusive management and control of the state within the meaning of that concept in the California Constitution and does not jeopardize our traditional form of governance and system of checks and balances. We conclude the Act is not a revision to the California Constitution within the meaning of article XVIII, sections 1 and 2.

## VIII

### EQUIVALENCY OF THE TOTAL TAX ON OTHER TOBACCO PRODUCTS AND ON CIGARETTES FOLLOWING ADOPTION OF THE ACT

 CART and CC contend the trial court incorrectly interpreted the interrelationship of Proposition 99 and the Act to impose a "double tax" on other tobacco products despite the plain language of the statutes to tax cigarettes and other tobacco products equivalently.[27] Moreover, they contend the interpretation violates the equal protection clauses of the state and federal Constitutions because the "double tax" imposed on other tobacco products bears no rational relationship to a legitimate state purpose.[28] We are unpersuaded by either contention.

Tobacco excise taxation in California commenced in 1959 when the Legislature enacted article I (Rev. & Tax. Code, § 30101— former § 30115), Tax on Distributors, in chapter 2 of part 13 of division 2 of the Revenue and Taxation Code. It imposed an excise tax on wholesale distribution of cigarettes and directed the tax revenue to the general fund. After several tax rate

---

[27] We have found unpersuasive CART and CC's assertion that the interpretation of the trial court and the Board violates the single-subject rule because the Act funds two separate and distinct subjects that are not reasonably germane to one another: the childhood development programs prescribed by the Act and the antitobacco programs of Proposition 99. (See fn. 5, *ante*.)

[28] The Attorney General unpersuasively contends that CART and CC have waived this argument by failing to brief it and relying only on the opening brief of McLane, which later dismissed its appeal with prejudice. Consistent with California Rules of Court, rule 13(a)(5), CART and CC expressly joined and incorporated by reference the text of McLane's argument in their opening briefs. Rule 13(a)(5) "is intended primarily to expedite briefing in multiparty appeals." (Advisory Com. com. (2001) rule 13.) The fact that McLane's appeal was later dismissed does not invalidate or render ineffectual CART and CC's prior express incorporations of McLane's opening brief.

increases, the current cigarette tax under Revenue and Taxation Code section 30101 is 12 cents per pack. In 1988, the electorate passed Proposition 99 that added article 2 (Rev. & Tax. Code, §§ 30121-30130), entitled Cigarette and Tobacco Products Surtax, imposing a 25-cent-per-pack tax on cigarettes to fund indigent healthcare, antitobacco education and research, and other miscellaneous programs. (Rev. & Tax. Code, §§ 30122 & 30123, subd. (a).) It also imposed for the first time a tax on wholesale distribution of other tobacco products "based on the wholesale cost of these products, at a tax rate, as determined annually by the State Board of Equalization, . . . equivalent to the combined rate of tax imposed on cigarettes by subdivision (a) and the other provisions of this part." (Rev. & Tax. Code, § 30123, subd. (b).) During the next decade, the Board interpreted and applied Proposition 99 to impose an identical tax rate on cigarettes and other tobacco products. The other tobacco products tax is based on the wholesale cost of these products at a tax rate equivalent to the rate of tax imposed on the wholesale cost of cigarettes. The tax rate on cigarettes is determined by dividing the tax per cigarette by the average wholesale cost per cigarette. For example, the average wholesale cost per cigarette for the 1996/1997 fiscal year was estimated to be \$0.063017. The tax at the time on cigarettes was \$0.0185 per cigarette. The cigarette tax rate for the 1997/1998 fiscal year was therefore 29.36 percent (\$0.0185/\$0.063017=.2936). The tax on other tobacco products was therefore set at 29.36 percent of the wholesale cost of other tobacco products.

In 1998, the Act added article 3 (Rev. & Tax. Code, §§ 30131-30131.6), specifically imposing on cigarette distributors a surtax of 50 cents per pack in addition to the 25-cent-per-pack tax imposed by Proposition 99 and the original 12-cent-per-pack tax. (Rev. & Tax. Code, § 30131.2, subd. (a).) The Act also imposes a tax on distributors of other tobacco products as follows: "In addition to the taxes imposed upon the distribution of tobacco products by Article 1 (commencing with Section 30101) and Article 2 (commencing with Section 30121), and any other taxes in this chapter, there shall be imposed an additional tax upon every distributor of tobacco products, based on the wholesale cost of these products, at a tax rate, as determined annually by the State Board of Equalization, which is equivalent to the rate of tax imposed on cigarettes by subdivision (a)." (Rev. & Tax. Code, § 30131.2, subd. (b).)

The drafters of the Act in their findings and declarations and the Attorney General in his summary for the initiative petition expressly stated that the

Act would impose an additional 50-cent-per-pack tax on cigarette distributors and an equivalent increase in tax on distributed tobacco products.[29] However, Board staff in May 1998 discovered that as a result of the statutory scheme implemented by Proposition 99 for determining the tax on other tobacco products, the statutory provisions of the Act would result in a tax increase on other tobacco products equivalent to not 50 cents, but $1. On December 7, 1998, the Board adopted that construction, concluding: (1) Proposition 99 imposes a tax on other tobacco products equivalent to the combined tax on cigarettes (Rev. & Tax. Code, § 30123, subd. (b)); (2) that section automatically increases the tax rate on other tobacco products annually to be equivalent with any increase in the tax rate on cigarettes in part 13 of the Revenue and Taxation Code; (3) the Act places the 50-cent increase on cigarettes in part 13, which, when the annual calculation is made for Revenue and Taxation Code section 30123, subdivision (b), will increase the tax on other tobacco products to be equivalent with the total tax imposed on cigarettes; and (4) the Act imposes an additional tax increase on other tobacco products equivalent to the additional tax on cigarettes of 50 cents per pack under Revenue and Taxation Code section 30131.2, subdivision (a). Consequently, the Board concluded that the impact of the Act on existing law is that the wholesale cost of other tobacco products would be taxed at a rate equivalent to $1.37 per pack cigarette tax, rather than $0.87 per pack. In May 1999, the Board set the 1999-2000 tax rate for other tobacco products at 66.5 percent of wholesale cost, and the tax rate for cigarettes at 42.23 percent of wholesale cost.[30]

The California Voter Information Guide and Ballot Pamphlet for the November 3, 1998 General Election advised the electorate as follows: The Attorney General's Official Summary stated that the Act would impose an "additional $.50 per pack tax on cigarette distributors and equivalent increase in state tax on distributed tobacco products." (*Id.* at p. 44.) Similarly, the "Findings and Declarations" in uncodified section 2, subdivision (n) of the Act stated that the measure would effect "[a] 50-cent-per-pack increase in the state surtax on cigarettes and an equivalent increase in the state surtax on tobacco products . . . ." (*Id.* at p. 122.) The analysis by the Legislative Analyst stated that a "YES" vote on the measure would increase excise taxes "on cigarettes [by] 50 cents per pack" and "on other tobacco products . . . by the equivalent of . . . $1 per pack." (*Id.* at p. 45.) In the analysis by the Legislative Analyst, the electorate was expressly advised:

---

[29]The original revenue estimates by the Board and the Joint Legislative Budget Committee reflected a single tax increase on other tobacco products of the equivalent of 50 cents per pack of cigarettes.

[30]The Board computed the tax rate for other tobacco products by calculating it as equivalent to a $1.37 per pack tax on cigarettes ($0.87 tax imposed on cigarettes plus an additional $0.50 per pack equivalent tax imposed by the Act on other tobacco products).

"The measure also increases the excise tax on other types of tobacco products—such as cigars, chewing tobacco, pipe tobacco, and snuff—in two ways:

"[1] The measure imposes a *new* excise tax on these products that is equivalent (the same percentage in relation to the wholesale costs of these products) to a 50 cent per pack tax on cigarettes.

"[2] Under current law, any increase in the tax on cigarettes automatically triggers an increase in the tax on other tobacco products. As a result, the measure increases the *existing* excise tax on these products by the equivalent of a 50 cent per pack increase in the tax on cigarettes, in addition to the amount above.

"Thus, the measure increases the excise taxes on other tobacco products in total by the equivalent of a $1 per pack increase in the tax on cigarettes."

 We interpret the Act mindful that our primary task is to determine the voters' intent. (*Howard Jarvis Taxpayers Assn. v. City of San Diego* (1999) 72 Cal.App.4th 230, 235 [84 Cal.Rptr.2d 804].) "In determining intent, we look first at the words of the proposition. [Citation.] When the language is clear and unambiguous, there is no need for construction nor is it necessary to resort to an ' " 'indicia of the intent . . . [by] the voters. . . .' [Citation.]" ' [Citations.] ' "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." [Citation.] Of course, in construing the statute, "[t]he words . . . must be read in context, considering the nature and purpose of the statutory enactment." ' [Citation.]" (*Id.* at pp. 235-236.)

 We conclude the trial court and the Board correctly interpreted the effect of the Act on the taxation of other tobacco products. Contrary to CART and CC's suggestion, Proposition 99 does not require that the *total tax* on other tobacco products in part 13 of the Revenue and Taxation Code be equivalent to the total tax on cigarettes in that part. Rather, it requires that the tax imposed on other tobacco products by Proposition 99 be equivalent to the combined tax imposed on cigarettes by part 13, which includes the Act's 50-cent cigarette tax increase. Similarly, the Act does not require that the *total tax* on other tobacco products in part 13 be equivalent to the total tax on cigarettes in that part. Rather, the Act simply requires that the tax imposed on other tobacco products *by it* be equivalent to the tax imposed on cigarettes *by it*. In other words, the cited representations by the drafters and

the Attorney General that the Act increases the tax on cigarettes by 50 cents and the tax on other tobacco products by an equivalent amount pertain solely to the additional taxes imposed by the Act and not the effect of those taxes on any existing statutory mechanism, including Proposition 99, to determine the tax on other tobacco products.

The language of the Act and Proposition 99 controls. The statutory language implemented by Proposition 99 expressly provides that the tax imposed on distributors of tobacco products shall be "equivalent to the combined rate of tax imposed on cigarettes by subdivision (a) and.the other provisions of this part [part 13]." (Rev. & Tax. Code, § 30123, subd. (b).) When the Act added a 50-cent-per-pack tax on cigarettes in part 13, it resulted in a corresponding increase in the Proposition 99 tax on other tobacco products. Further, the Act clearly provides that *its* tax on other tobacco products is "[i]n addition to" the tax imposed on other tobacco products under Proposition 99 and that this additional tax shall be equivalent to the 50-cent rate of tax imposed on cigarettes by the Act. (Rev. & Tax. Code, § 30131.2, subd. (b).) Combined with the Proposition 99 tax on other tobacco products, the Act had the effect of increasing the tax on other tobacco products by $1 for a total equivalent to $1.37-per-pack cigarette tax. Indeed, if the proffered interpretation of CART and CC were true that the total tax on other tobacco products in part 13 must be equivalent to the total tax on cigarettes in that part, the other tobacco products tax imposed under the Act would be zero because the tax rate on such products under Proposition 99 is itself equivalent to the total tax on cigarettes. Consequently, Revenue and Taxation Code section 30131.2, subdivision (b) would be devoid of meaning and surplusage—a result the court seeks to avoid in construing statutory language to ascertain the intent of the electorate and to effectuate the purpose of the law (*Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1136, fn. 11 [203 Cal.Rptr. 886]).

It is undisputed that the drafters of the Act did not anticipate this combined effect of the Act and Proposition 99 on the excise taxes imposed on other tobacco products.[31] However, their original intent does not affect our interpretation of the language of the statutory scheme. Rather, we interpret it to effectuate the electorate's intent because the language of the statutes is the most reliable indicator of that intent. (*People v. Garcia* (1999) 21 Cal.4th 1, 14, fn. 8 [87 Cal.Rptr.2d 114, 980 P.2d 829].) The language of the statutory scheme compels our interpretation, which is consistent with the ballot pamphlet materials summarized above. We are not persuaded by the suggestion that the statements of the drafters in the Act and the Attorney General in

---

[31]However, the drafters of the Act became aware of the combined effect before the election.

his title and summary conflict with the Legislative Analyst's summary and analysis of the Act. The former accurately represents that the Act *itself* imposes a tax on other tobacco products equivalent to *its* tax on cigarettes to fund *its* programs. The latter simply more globally details the impact of the Act on the existing Proposition 99 mechanism to determine the tax rate on other tobacco products and their *combined* effect on the taxing of those products. We assume the voters duly considered and understood these materials. (*Manduley v. Superior Court, supra,* 27 Cal.4th at p. 580; *Raven v. Deukmejian, supra,* 52 Cal.3d at p. 349.)[32]

CART and CC contend that as a result of this statutory interpretation the Act violates the federal and state constitutional guarantees to equal protection of the laws (U.S. Const., amend. XIV, § 1; Cal. Const., art. I, § 7 & art. IV, § 16), because it discriminates between distributors and retailers of other tobacco products and retailers and distributors of cigarettes. They argue there is no rational basis to treat the two groups differently.

The equal protection clause does not prevent the Legislature, or the electorate by initiative, from asserting its taxing power or adjusting its taxing legislation to differences in situation and classifying accordingly; however, it does require that the classification not be arbitrary but predicated on a real and substantial difference having a reasonable relation to the subject of the legislation. (*Barker Bros., Inc. v. Los Angeles* (1938) 10 Cal.2d 603, 607 [76 P.2d 97].) The electorate is afforded great latitude in drawing distinctions between classes when enacting tax measures, provided the distinction is based on some meaningful difference that has a fair and substantial relation to the object of the legislation. (See *Cohan v. Alvord* (1984) 162 Cal.App.3d 176, 182 [208 Cal.Rptr. 421].) If the challenged classification is based on

---

[32]We find unpersuasive the argument that the use of the word "surtax" in the Act is different from the use of the word "tax" in Proposition 99 to bolster the assertion that the tax on cigarettes and on other tobacco products should remain equivalent after the adoption of the Act. This suggestion is flawed by the fact that both initiatives use the terms interchangeably. (Compare Rev. & Tax. Code, § 30122, subd. (a), with § 30123, subds. (a) & (b); compare Rev. & Tax. Code, § 30131.2, subd. (b), with uncodified § 2, subd. (n).)

Finally, the legislative history and long-standing administrative interpretation of Proposition 99 do not require the tax on cigarettes and other tobacco products be equivalent after the adoption of the Act. That legislative history and administrative interpretation apply solely to the application of Proposition 99 unaffected by the provisions of the Act. On the adoption of the Act, the tax on other tobacco products of Proposition 99 was no longer the sole tax on such products. Instead, the Act added a 50-cent cigarette tax to part 13, which triggered an equivalent increase in the Proposition 99 tax on other tobacco products. The tax imposed on other tobacco products by Proposition 99 continues to be equivalent to the combined rate of tax on cigarettes in part 13, but the total tax on other tobacco products is now higher than the total cigarette tax because the Act imposed its own, independent tax on other tobacco products.

natural, intrinsic or fundamental distinctions that are reasonable in their relation to the object of the legislation, then it will be deemed to be valid and binding. (*Fox etc. Corp. v. City of Bakersfield* (1950) 36 Cal.2d 136, 142 [222 P.2d 879].) ▮▮ "Tax classifications carry a presumption of constitutionality [that] can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons or groups. (*R. H. Macy & Co.* v. *Contra Costa County* (1990) 226 Cal.App.3d 352, 362 [276 Cal.Rptr. 530].) The party who challenges the constitutionality of a classification in a tax statute bears a very heavy burden; it must negate any conceivable basis [that] might support the classification. (*Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973) 410 U.S. 356, 364 [35 L.Ed.2d 351, 357-358, 93 S.Ct. 1001,]; *R. H. Macy & Co.* v. *Contra Costa County, supra,* at p. 362.)" (*City of Berkeley v. Cukierman* (1993) 14 Cal.App.4th 1331, 1342 [18 Cal.Rptr.2d 478].) Consequently, where a classification is questioned, it will be upheld if any state of facts can reasonably be conceived that would sustain it (*Gowens v. City of Bakersfield* (1961) 193 Cal.App.2d 79, 84 [13 Cal.Rptr. 820]) and will not be judicially invalidated unless palpably arbitrary (*United Air Lines, Inc. v. County of San Diego* (1991) 1 Cal.App.4th 418, 432 [2 Cal.Rptr.2d 212]; *U.S. Industries, Inc. v. State Board of Equalization* (1962) 198 Cal.App.2d 775, 790 [18 Cal.Rptr. 171]; *Roth Drug, Inc. v. Johnson* (1936) 13 Cal.App.2d 720, 733 [57 P.2d 1022]). ▮▮ "Finally, tax statutes are generally not subjected to close scrutiny, and *distinctions therein can be justified on the basis of administrative convenience and promotion of legitimate state interests.* [Citations.]" (*City of Berkeley v. Cukierman, supra,* 14 Cal.App.4th at pp. 1342-1343 (original italics); *Carmichael v. Southern Coal & Coke Co.* (1937) 301 U.S. 495, 511 [57 S.Ct. 868, 873, 81 L.Ed. 1245, 109 A.L.R. 1327]; *Haman v. County of Humboldt* (1973) 8 Cal.3d 922, 925-926 [106 Cal.Rptr. 617, 506 P.2d 993]; *Cohan v. Alvord, supra,* 162 Cal.App.3d at p. 182.)

▮▮ The natural difference between cigarettes and other tobacco products is reflected by the way the Revenue and Taxation Code defines them. Specifically, Revenue and Taxation Code section 30121, subdivision (b) defines other tobacco products as including "all forms of cigars, smoking tobacco, chewing tobacco, snuff, and any other articles or products made of, or containing at least 50 percent, tobacco, but does not include cigarettes." Revenue and Taxation Code section 30003 defines cigarette as "any roll for smoking, made wholly or in part of tobacco, irrespective of size or shape and irrespective of whether the tobacco is flavored, adulterated or mixed with any other ingredient, where such roll has a wrapper or cover made of paper or any other material, except where such wrapper is wholly or in the greater part made of tobacco and such roll weighs over three pounds per thousand."

(See Rev. & Tax. Code, § 30121, subd. (a).) Cigarettes and other tobacco products differ in form, packaging and content and are used differently. From data presented below regarding the impact of the Act, it is evident that over 90 percent of the tax revenue generated solely by the imposition of the increased excise taxes is attributable to the distribution of cigarettes and approximately 6 percent is attributable to the distribution of other tobacco products. These percentages reflect the disproportionate roles played in the taxing scheme of the two classifications at the time of the adoption of the Act; the measure taxes annually the distribution of over 1.2 billion packs of cigarettes in comparison to the distribution of approximately $100 million in wholesale cost of other tobacco products. Consequently, given the volume of consumption, tax role, common use and distinctive uniform packaging of cigarettes, administrative convenience justifies this natural and pragmatic classification.

CART and CC complain that they are being taxed at a higher rate than those who distribute cigarettes. However, they must negate any conceivable basis for the classification and demonstrate that it is palpably arbitrary to prevail in their challenge. The trial court listed several other *possible* rational bases for the distinction between cigarettes and other tobacco products and the higher tax rate.[33] For example, the Legislative Analyst expressly advised the electorate that the Act would result in a decrease in revenues to the Cigarette and Tobacco Products Surtax Fund implemented under Proposition 99, but the Act would partially offset this decrease by an increase in the revenues generated by the existing excise tax on other tobacco products implemented by Proposition 99 and the requirement that any losses to Proposition 99 health-related education and research programs be offset by revenues generated from the new excise taxes established by the Act. Consequently, the electorate could have rationally decided to place a higher

---

[33]The trial court suggested several other *plausible* justifications for taxing other tobacco products at a higher rate than on cigarettes. Candidly, we find them individually unpersuasive, without universal application to all members of the class and of doubtful validity. The trial court suggested that possibly voters believed because the primary users of cigars and pipe tobacco are adults with more income than children, a higher tax is necessary to discourage the use of those products by the more affluent population. Even were we to assume that to be true as to those two particular products, is it true with regard to chewing tobacco? Similarly, although many voters may consider cigar smoking as well as tobacco chewing more offensive than cigarette smoking, thus warranting higher taxes to deter them, can the same be said of pipe tobacco and snuff? Finally, the trial court suggested that the electorate might have believed that cigar smoking emits a greater volume of toxic substances than cigarettes, warranting the increased tax rate. Again, can the same be said of the other products in the class? We note, however, that differential tax treatment can be rationally based and justified on the toxic nature of the particular commodity taxed. (See *People v. Cook* (1974) 34 N.Y.2d 100 [356 N.Y.S.2d 259, 264, 312 N.E.2d 452, 455-456] [sustaining a price differential depending upon tar and nicotine content of cigarettes].)

tax rate on other tobacco products than on cigarettes to offset the decrease in Proposition 99 tax revenues. Accepting the common wisdom that increased taxation reduces consumption and promotes tax evasion, the electorate could have reasonably made this election given the disproportionate roles the two classes of product play in the tax scheme. The need to offset lost revenue generated by other tax mechanisms is itself a sufficient justification for an increase in taxes. (See *City of Berkeley v. Cukierman, supra,* 14 Cal.App.4th at p. 1343, and cases there cited.)

 It is firmly established "that neither due process nor equal protection imposes a rigid rule of equality in tax legislation." (*City of Berkeley v. Cukierman, supra,* 14 Cal.App.4th at p. 1344; *Carmichael v. Southern Coal & Coke Co., supra,* 301 U.S. 495, 509 [57 S.Ct. 868, 872]; *Cohan v. Alvord, supra,* 162 Cal.App.3d at p. 184; *Henry's Restaurants of Pomona, Inc. v. State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1016 [106 Cal.Rptr. 867].) Inequalities, which arise from the singling out of one particular class for taxation or exemption, infringe no constitutional limitation. (*Carmichael, supra,* 301 U.S. at p. 509 [57 S.Ct. at p. 872].) Differing tax rates may be imposed upon different classes provided the classification created is reasonable. (See *United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 178 [154 Cal.Rptr. 263].) Further, no constitutional rights are violated if the burden of the tax falls equally upon all members of the class, even though other classes bear lighter burdens or are wholly exempt, provided that the classification is reasonable and is not arbitrary. (See *Fox etc. Corp. v. City of Bakersfield, supra,* 36 Cal.2d at p. 142; *City of Berkeley, supra,* at p. 1344; *Park 'N Fly of San Francisco, Inc. v. City of South San Francisco* (1987) 188 Cal.App.3d 1201, 1213 [234 Cal.Rptr. 23].) It follows that where, as here, the classification itself is reasonable or the challengers have failed to meet their burden of negating any conceivable basis for it, disparity in tax rates between classes, or a dramatic increase in a tax rate as to one distinct class, does not violate equal protection of the laws. Indeed, courts have repeatedly upheld rate increases and disparities far greater than the one involved here. (See *City of Berkeley,* at pp. 1344-1345; *Park 'N Fly of San Francisco, supra,* 188 Cal.App.3d at pp. 1213-1214.)[34]

---

[34]At the time Proposition 99 was adopted, there was no uniform approach among the states for taxing cigarettes and other tobacco products. Although a few jurisdictions taxed the classes approximately equivalently, the vast majority of the states taxed them differently with no consistency as to the favored class. In fact, before the adoption of Proposition 99, for 39 years this state imposed an excise tax on cigarettes but none on other tobacco products.

An Illinois Supreme Court decision in *Arangold Corp. v. Zehnder* (2003) 204 Ill.2d 142 [272 Ill.Dec 600, 787 N.E.2d 786] upheld a tax on only noncigarette tobacco products, the proceeds of which fund governmental programs providing long-term care for the indigent.

## DISPOSITION[35]

The judgment is affirmed. The parties shall bear their own costs on appeal.

Huffman, Acting P. J., and McConnell, J., concurred.

The petition of all appellants for review by the Supreme Court was denied September 24, 2003. George, C. J., did not participate therein.

---

[35]Because of our resolution of the constitutional challenges, it is unnecessary for us to address whether the provisions of the Act are severable.